# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### June 6, 2006 Session

## FARRIS GENNER MORRIS, JR. v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Madison County**
**No. C01-50  John Franklin Murchison, Judge**

---

**No. W2005-00426-CCA-R3-PD  - Filed October 10, 2006**

---

Capital Petitioner, Farris Genner Morris, Jr., appeals as of right the judgment of the Madison County Circuit Court denying his petition for post-conviction relief. In January 1997, the Petitioner was convicted after a jury trial of two counts of premeditated first-degree murder and one count of aggravated rape. The Petitioner was sentenced to death for the first degree murder of Erica Hurd. For the remaining convictions, the Petitioner received consecutive sentences of life without the possibility of parole for the murder of Charles Ragland and twenty-five years incarceration for the aggravated rape of Angela Ragland. The Petitioner's convictions and sentences were affirmed on direct appeal by the Tennessee Supreme Court. See State v. Morris, 24 S.W.3d 788 (Tenn. 2000), cert. denied, 531 U.S. 1082 (2001). On February 6, 2001, the Petitioner filed a pro se petition for post-conviction relief. The trial court appointed the Office of the Post-Conviction Defender to represent the Petitioner in the proceedings. An amended petition was filed on December 17, 2001. An evidentiary hearing was conducted in April 2004. On January 18, 2005, the trial court entered an order denying the Petitioner post-conviction relief. On appeal to this Court, the Petitioner presents a number of claims that can be characterized in the following four broad categories for this Court's review: (1) the denial of a fair post-conviction evidentiary hearing, (2) the denial of a fair sentencing hearing, (3) the ineffective assistance of counsel, and (4) the constitutionality of the imposition of a sentence of death. Following a thorough and exhaustive review of the record and the applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which J.C. McLIN, J., joined. GARY R. WADE, P.J., not participating.

Donald E. Dawson and Paul J. Morrow, Nashville, Tennessee, for the appellant, Farris Morris, Jr.

Paul G. Summers, Attorney General and Reporter; Mark E. Davidson, Assistant Attorney General; Jerry Woodall, District Attorney General; and Al Earls, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Facts Underlying the Petitioner's Convictions

The proof, as set forth in our supreme court's decision on direct appeal, established the following:

Charles and Angela Ragland lived in a duplex residence in Jackson, Tennessee. The defendant, Farris Genner Morris, lived with his wife in the adjoining residence.

In the early morning hours of September 17, 1994, Angela Ragland arrived at her home along with her 15-year-old cousin, Erica Hurd. Charles Ragland was awake in the bedroom with the light on. Shortly after arriving, Erica went outside to retrieve something from the car. When Erica came back into the house, Angela heard a scream and saw that Morris was holding a shotgun to Erica's head.

Morris pushed Erica onto the bed in the Raglands' bedroom and asked Charles "where the dope was." Charles Ragland replied that he "didn't have any" and asked Morris if he wanted money. After Morris responded that he would "find it himself," Morris fired a shot into the floor and ordered Charles Ragland to get on the floor. He placed a pillow on Ragland's head and shot him one time in the head.

Morris ordered Erica to get into a closet by threatening to "blow her head off." He forced Angela into another bedroom, tied her wrists and ankles, and covered the window with a mattress so that "nobody could see if they walked by." Morris then retrieved Erica from the closet. Angela Ragland testified that she heard Erica pleading for Morris not to kill her and that she heard Morris say "shut up." She testified that she heard Erica screaming and gasping for breath, and then silence.

Morris returned to the bedroom and, still holding the shotgun, forced Angela Ragland to bathe him. Afterward he ordered Angela to put on a negligee and make him something to eat, which she did. Morris then forced Angela to have sexual intercourse with him "three or four times" and to perform oral sex upon him. Morris told her that he had once been "accused of raping someone and . . . if he was going to jail, he was going to go to jail for doing something." He told Angela that "society made him the way he was" and "was the reason that he was doing what he did."

-2-

Around 6:30 a.m., Morris heard his wife in the adjoining residence and told Angela that he would let her go. He instructed her to tell police that she found the bodies of her husband and cousin when she arrived home that morning. Morris used a cloth to wipe off objects he had touched and he warned Angela not to go to the police. Angela fled to the house of a nearby fried, who drove her to the police station. The police found Morris at his home shortly thereafter and arrested him.

The bodies of Charles Ragland and Erica Hurd were later discovered in the Ragland residence. Charles Ragland had been shot in the head. Erica Hurd had been beaten and stabbed repeatedly. A blood-stained steak knife was found behind a couch and a large butcher knife with traces of blood was found in a chair in the living room. Angela Ragland testified that neither knife belonged to her or her husband. A 12-gauge pistol grip, pump action shotgun was later found underneath Morris's dresser drawer.

After being advised of and waiving his constitutional rights, Morris gave a statement to Officers Patrick Willis and James Golden of the Jackson Police Department. Morris said that on the day of the offense he had purchased and smoked $250 worth of cocaine. He admitted that he had an exchange with Charles Ragland at 1:00 a.m., just a few hours prior to the murders, in which he asked Ragland to sell him drugs and, when Ragland declined, told Ragland that "he was going to regret disrespecting me." Morris admitted that he went to his house, got his shotgun, loaded two shells into the shotgun, and waited for Ragland's wife, Angela, to get home. Morris admitted that he entered the Ragland's residence with the shotgun and demanded that Charles Ragland sell him drugs. He admitted that after Ragland said he didn't have any drugs, he fired a shot into the floor, put a pillow over the barrel of the gun and shot him in the head. Morris admitted that he put Erica Hurd in a closet and tied up Angela Ragland. Morris told officers that he intended only to tie up Erica Hurd but that he stabbed her because she acted crazy and they struggled over a knife. Morris admitted he had sexual intercourse and oral sex with Angela Ragland.

Dr. O.C. Smith, the Deputy Chief Medical Examiner for West Tennessee, testified that Charles Ragland died from a shotgun wound to the head. Dr. Smith testified that he found evidence of an "intermediate target" between the weapon and Ragland's head, but that Ragland's death was "instantaneous because the brain [was] destroyed."

Dr. Smith testified that Erica Hurd had died as a result of multiple injuries including, stab wounds, blunt trauma to the head, skull fractures, and damage to the brain. Dr. Smith found that there were 37 stab wounds, 23 of which were sustained prior to death and 14 of which were post-mortem. Dr. Smith testified that 25 of the stab wounds were to the victim's neck and face and that the force of the stabbings was great enough to cause the knife blades to bend upon striking bone.

The defense theory focused on Morris's use of crack cocaine. In addition to Morris's own statement to police, Russell Morris, the defendant's brother, testified that he saw the defendant smoking crack around 5:15 p.m. on the evening before the murders.

Dr. Robert Parker, a doctor of pharmacology at the University of Tennessee, testified about the effects of crack cocaine use. Parker testified that smoking crack cocaine produces an intense euphoria and symptoms such as excitability, paranoia, mania, and impaired judgment. Parker testified that most users of crack cocaine go on a "cocaine run" or "binge." When users become unable to duplicate the feeling of euphoria from the initial uses of the drug, judgment is further impaired and there is "an increased risk of violent or homicidal behavior." Parker explained that an acute withdrawal or "crash phase" occurs when the drug is not used. It can be marked by depression, exhaustion, paranoia, anxiety, and suicidal thoughts. Parker testified that the evidence of Morris's behavior was "consistent with the ingestion of cocaine."

Dr. William Bernet, medical director of the Psychiatric Hospital at Vanderbilt University, testified that he evaluated Morris based on an interview and a review of various records and documents. Dr. Bernet concluded that due to false accusations of rape prior to these offenses, Morris became suicidal and a crack cocaine user. Dr. Bernet stated that the mental stress and use of crack cocaine "affected [Morris's] judgment" and "may have prevented him from forming the intent" to commit the murders of Charles Ragland and Erica Hurd.

. . . .

### Penalty Phase

Dr. O.C. Smith again testified regarding his findings from the autopsy of Erica Hurd, including the blunt trauma, skull fractures, and 37 stab wounds. Dr. Smith said that the wounds would have been painful and that the stab wounds that struck bone would have caused severe pain. Dr. Smith explained that the wounds were "in areas that may be targeted, the face, the head, the chest, the back," and that they showed "sites of selection, as opposed to a random pattern of distribution." Dr. Smith, noting that some of the wounds were severe and others were superficial, testified that it "may imply an element of control . . . or it may imply an element of torment by being very superficial in nature."

Several witnesses testified on behalf of the defendant. Mickey Granger, the defendant's employer, testified that Morris was a good, dependable employee who suffered a "downhill slide" in performance when accused of rape shortly before these

offenses. Granger became aware of Morris's drug problem when he found a crude crack pipe fashioned from a soft drink can.

Jack Thomas, a friend of the defendant's, testified that when he visited Morris in prison, Morris admitted his responsibility for the killings but denied that he raped Angela Ragland. According to Thomas, Morris said that he had used a large amount of cocaine on the night of the offenses in an effort to overdose. Several other witnesses, including teachers and prison employees, testified that Morris is a good student, participates in class, and is punctual. Several of the witnesses testified that Morris helps others inmates, studies frequently, and uses reference material from the library. The defendant did not testify.

The jury imposed a death sentence for the first degree murder of Erica Hurd after finding that the evidence of two aggravating circumstances-that the murder was "especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death," and that the murder was "committed while the defendant was engaged in committing . . . any first degree murder, rape, burglary or kidnapping"-outweighed mitigating evidence beyond a reasonable doubt. See Tenn. Code Ann. § 39-13-204(i)(5) and (7).

The jury imposed a sentence of life without parole for the murder of Charles Ragland after finding that the evidence of two aggravating circumstances-that the defendant "knowingly created a great risk of death to two or more persons other than the victim murdered during the act of murder" and that the murder was committed while the defendant was engaged in committing any "first degree murder, rape, burglary or kidnapping"-did not outweigh mitigating evidence beyond a reasonable doubt. Tenn. Code Ann. § 39-13-204(i)(3) and (7). In a separate sentencing hearing, the trial court imposed a 25-year sentence for the aggravated rape conviction and ordered that it be served consecutively to the sentence of life without parole.

Morris, 24 S.W.3d at 792-794 (footnotes omitted).

**Proof at Post-Conviction Evidentiary Hearing**

A hearing on the petition for post-conviction relief was held in the Madison County Circuit Court on April 13 and 14, 2004. During this hearing, the following proof was presented.

Mickey Granger, the Petitioner's former employer at Griffin Funeral Home and Ridgecrest Cemetery, acknowledged that he had testified at the Petitioner's trial. He stated that, while employed, the Petitioner performed duties in cemetery maintenance, grave digging and general handy person functions. Mr. Granger testified that the Petitioner was an "exceptional" grave digger, explaining that he "could do a very fine job in a very short period of time." In fact, the Petitioner could dig four or five graves in one day. Mr. Granger stated that the Petitioner "preferred to dig [graves] alone" and, when he was digging a grave, "he was in his own world," "making noises," like

"Chh, Chh." He added that the Petitioner would work "very intently for about five or six minutes and maybe take a minute or two breather and go right back to it." The Petitioner would maintain this rhythm all day long.

Mr. Granger further related that the Petitioner "had some wide mood swings." He explained:

> Well, some days – and, of course, we all do this. But some days, he would come to work and just not – not Farris. I was unable to get him to talk about maybe something that had happened or he – he just had some wide mood swings and would not have much conversation with anybody. Sometimes it was a little bit more difficult for me to get him into the day's work schedule especially if he wasn't digging graves.

Mr. Granger admitted that the Petitioner was in a better mood when he was digging graves, most likely due to the pay scale being better. He continued that "[t]here were times that Farris got offended quite easily especially if he felt like that someone was possibly ignoring him, not respecting him or being friendly toward him." Mr. Granger further testified that he learned from discussions he had with the Petitioner that the Petitioner "had a problem with his role in society and how he thought other people viewed him." He stated that, during such discussions, the Petitioner would become agitated.

Mr. Granger stated that the Petitioner had a "good relationship with his brother Russell." He added that the Petitioner's father frequently visited the Petitioner at the cemetery. Mr. Granger commented that the Petitioner had "verbalized . . . on numerous occasions that he and his mother did not have a good relationship."

Mr. Granger admitted that he had found evidence indicating that the Petitioner "would be drinking on the job especially when digging graves." The evidence would be in the form of beer cans near the gravesite.

On cross-examination, Mr. Granger stood by his previous trial testimony that the Petitioner was a good employee. Mr. Granger stated that the Petitioner was not violent towards other employees. He further admitted that "there was evidence of some type of drug use – a period of time from when he was supposedly charged with Rape until the crime."

Russell Morris, the Petitioner's younger brother, explained that there were four children in their family – a sister, the Petitioner, another brother and himself. Russell Morris stated that his father had a relationship with Christine Dodd and the two had children together. Ms. Dodd and her children came to live in the Morris family home, even while their mother was living in the home. Russell Morris described their mother as "hard on all of us," but especially hard on the Petitioner. He stated that their mother would get angry and "kick" the Petitioner out of the house. He explained that the Petitioner would argue back to his mother, while he would not. Russell Morris described that his mother had mood swings. Specifically, he stated that "one minute she may be . . . laid back . . . [a]nd the first little thing that one of us might do pertaining to me and my oldest brother . . . we would catch it from her. And her mood would change . . . ." He could not explain why his mother

was harder on the Petitioner than she was on the other children, but he stated "she didn't go to the extremes to whip us like she would him." During confrontations with their mother, the Petitioner would "try to prove his point" and would argue back with her. The confrontations would result in their mother telling the Petitioner to "get your stuff and go."

On cross-examination, Russell Morris stated that the Petitioner drank alcohol and used drugs. He further stated that their mother drank beer.

George Morton Googe, the Public Defender for the Twenty-Sixth Judicial District, testified that, at the time of the Petitioner's case, the caseload for his office was "heavy." Mr. Googe stated that the Capital Case Resource Center was available to his office when the matter was in the lower court; however, he recalled that the "Capital Case Resource Center had either been defunded or was in the process of being defunded by the legislature at the time this case was cranking up under the death penalty situation." Mr. Googe explained that he did not consult with the Capital Case Resource Center for the reasons that "they were basically going out of business." He added that he also did not seek assistance from any other death penalty assistance organizations. He acknowledged that the death notice was given on July 10, 1995. Mr. Googe stated that, prior to the Petitioner's trial, he had attended several capital case seminars. He added that he did consult with another District Public Defender regarding capital cases.

Mr. Googe further related that, at the time of the Petitioner's trial, Assistant Public Defender Dan Taylor had been co-counsel with him on a number of first degree murder cases. Mr. Taylor had been with the Public Defender's Office for several years at the time of the Petitioner's trial. Mr. Googe explained that, although Mr. Taylor "was younger and less experienced than me[,] . . . I wanted him on the case because sometimes some of my younger Assistants have been better than somebody that's been in practice a long time." Mr. Googe stated that Jesse H. Ford, III was added as co-counsel in this case several months prior to the trial.

Mr. Googe acknowledged that, at the time of the Petitioner's trial, he was unaware that Assistant District Attorney Earls had previously represented the Petitioner in a cocaine case when he was a public defender. For this reason, Mr. Googe did not file any motions regarding Mr. Earls' disqualification.

Mr. Googe testified that Glori Shettles is an employee of Inquisitor in Memphis, Tennessee. Ms. Shettles was obtained to function as a mitigation specialist in the Petitioner's case. He stated that funds were approved for Ms. Shettles' services in the "late part of 1995." He acknowledged that he obtained an initial grant of $3,000.00 for her services. He later was able to seek additional funding for her services. Mr. Googe explained that a mitigation specialist will develop the client's social history and background in order to determine information and circumstances that could be considered in mitigating a defendant's role or culpability for the offense. Regarding Ms. Shettles' duties, Mr. Googe acknowledged that she would need various records from the Petitioner's life, including military records. Mr. Googe could not recall if the Petitioner's military records were not obtainable or whether there was nothing in the records that was helpful. Mr. Googe testified that it may have been that the Petitioner did not have an honorable discharge.

Mr. Googe first met the Petitioner shortly after his arrest on September 21, 1994. Mr. Googe continued to meet "fairly regularly" with the Petitioner up until the actual trial, although not as regularly if the Petitioner had been detained in Madison County. Mr. Googe related that the Petitioner was being held at the Northwest Correctional Facility in Tiptonville, Tennessee, as the result of a community corrections violation. Mr. Googe testified that he "always enjoyed talking to Mr. Morris. He was a very good client, very cooperative . . . ." Notwithstanding, Mr. Googe acknowledged that the Petitioner "could be volatile as far as having trouble controlling . . . the volume of his voice." He added that the Petitioner was "very talkative," but would not often stay on topic. Mr. Googe stated that the Petitioner wrote "some essays," "poetry," and was working on a book.

Regarding security at the Petitioner's trial, Mr. Googe stated that the security was "fairly heavy." He acknowledged that he, himself, "was a little bit afraid . . . that some of the people that were outraged about the crime could try something." Mr. Googe testified that the Petitioner "was beaten up at the jail" and, at the trial, some "ammunition [was] taken off of a relative or family member of the victims." He added that he requested that "the Sheriff have only plain clothes people around Mr. Morris and that one of the Deputies that was a little volatile himself be placed in another part of the Courtroom." Mr. Googe further stated that the Petitioner's demeanor throughout the trial was "quiet and respectful." He recalled that "[the Petitioner] would have probably been shackled between the time he would get off the elevator and go to our – to the jury room." He explained that they would meet in the jury room prior to the start of the trial. Mr. Googe stated that they "didn't want him in shackles in front of the jury. . . . And I think he was allowed to walk with me from the jury room across through the Courtroom to the table where we sat." Mr. Googe explained that, "after the guilty verdict[,] . . . he was restrained at least with leg irons, and he may have had handcuffs on then." He admitted that he could not recall "absolutely one way or the other," although he did recall the leg irons and possibly handcuffs after the guilt phase. Mr. Googe opined that the jury would have been able to see the restraints. Although he was uncertain, Mr. Googe felt that the Petitioner did have a hand free of restraint at the penalty phase with which to take notes.

As to the composition of the Petitioner's defense team, Mr. Googe stated that he assumed the position of lead counsel. Jesse Ford "came on primarily to help us with the guilt-innocence phase of the trial." Daniel Taylor was co-counsel for the entire trial, but "one of his primary roles was the mitigation as well as the mental condition and pharmacological aspects because they played into each other in both phases." Mr. Googe stated that interviewing the witnesses was left mainly to co-counsel, the investigators, and Ms. Shettles.

Regarding the Petitioner's family, Mr. Googe was aware that the Petitioner "had a wife . . . and some children that left town after this." The Petitioner did not want his family involved. Mr. Googe related that the Petitioner's mother did visit him after the Petitioner "was beaten in the jail." The Petitioner's mother was "emotionally upset and not in good health." Mr. Googe explained that the Petitioner did not want his mother called as a witness. Mr. Googe further related that the majority of the Petitioner's relatives were from out of town, mostly St. Louis. Ms. Shettles interviewed the Petitioner's out of town family members. Ms. Shettles related to Mr. Googe that the Petitioner's childhood "was more or less unremarkable as far as anything that jumps out at you

at mitigation." Mr. Googe further remarked that they determined that there was no beneficial mitigation information contained in the Petitioner's school records.

Mr. Googe and Mr. Taylor shared the responsibility for filing motions. Mr. Googe recognized a "checklist of possible or potential Motions" that was in his case file and most likely was from the "1992 TACDL Death Penalty Manual." Mr. Googe admitted that he did not file a "Bill of Particulars with regard to the aggravating circumstances." Regarding the death of victim Erica Hurd, Mr. Googe admitted that he was surprised to learn the "length of time the surviving victim estimated between when the attack began . . . and when the gasping for breath supposedly ended."

Mr. Googe testified that the jury members in the Petitioner's trial were all Caucasian. At the time of the trial, Mr. Googe estimated that approximately thirty percent of the residents of Madison County were African-American. He further stated that probably less than thirty percent of the venire were African-American. He stated that the composition of the jury pool "was fairly consistent with what [he had] seen in other trials, although the finished product – the jury of twelve was not necessarily that." Mr. Googe added that, since the Petitioner's trial, the percentage of African-Americans on Madison County jury panels had increased.

Mr. Googe testified that the services of Dr. Parker, a pharmacologist, were retained by the defense. Dr. Parker was an expert in the effects of drugs and their characteristics and how they can affect the human body and behavior. Dr. Parker was retained to "demonstrate to the Court during suppression motions as well as demonstrate to the jury during the trial and sentencing phases what effect the abuse or use of crack cocaine can have on someone's behavior and what it will cause – what symptoms and how it can cause them to act differently." Dr. Parker testified at the suppression hearing in an effort to demonstrate that the Petitioner's confession was invalid as a result of his intoxication with cocaine and/or his withdrawal from cocaine. Dr. Parker testified at both the suppression hearing and at the guilt phase of the Petitioner's trial. Relying upon documents authorizing Dr. Parker's services, Mr. Googe confirmed that Dr. Parker spent a total of six hours on the Petitioner's case. Mr. Googe further conceded that Dr. Parker never spoke directly with the Petitioner.

The defense team also retained the services of a psychiatrist, Dr. William Bernet. Dr. Bernet was to testify that the cocaine intoxication and cocaine withdrawal would have disturbed the Petitioner's ability or reduced his culpability in forming a specific intent for premeditated murder. This testimony was to be used in mitigation as well. Dr. Bernet was provided numerous documents from the defense team, including the affidavit of complaint, the incident report, the police interview with Angela Ragland, the police interview with the Petitioner, and the forensic interview by Richard Drewery and Rick Pullen. He was also provided statements by Dr. Parker and a chapter on "Cocaine-Related Disorders" from Comprehensive Textbook of Psychiatry. A document was introduced indicating that Dr. Bernet spent nine hours on the Petitioner's case. Mr. Googe commented, however, that this document may have not been the final bill as it was dated in 1996.

Mr. Googe testified that, based on Dr. Bernet's findings, it did not appear that the Petitioner suffered from any mental illnesses. Generally, it appeared that the Petitioner was "basically a good

person and a hard worker when he was not on cocaine." Mr. Googe commented that the examination completed by Dr. Drewery was not helpful. Notwithstanding, he acknowledged that, during the evaluation, police officers were present and the Petitioner was in handcuffs and displayed signs of agitation. The evaluation revealed that the Petitioner was of the opinion that he was unable to obtain a fair trial because the jury had a biased opinion due to the media. Although he could not recall the Petitioner stating there was a conspiracy against him, he did recall that the Petitioner felt that "things were against him." During the evaluation, the Petitioner commented that he preferred his penalty be death and that he did not want to "live in the community because people are 'rats, stumbling blocks, no concern about humanity out there, no respect out there. People care only about money.'" Dr. Bernet's evaluation further showed that the Petitioner felt "that he had mental problems at that time and 'would break out in a cold sweat for no reason feeling depressed.'" The Petitioner further stated that he was "racked up with pressures." Moreover, the Petitioner commented that he felt that this affected his behavior and that he was "not able to make judgment decisions properly."

Mr. Googe confirmed that Ms. Shettles obtained Department of Correction documents for Petitioner Morris. The record reflected that the Petitioner was bothered by the "small closed-in area" and had to be pacified by an officer. There was also indications that the Petitioner was observed "crying" in his cell.

Mr. Googe testified that an investigator with their office interviewed the Petitioner's wife, Karen Morris. Karen Morris "stated that [the Petitioner] possibly needed a doctor's care for some type of mental disorder. [The Petitioner] had severe mood swings and was easily excited along with a very bad temper." Mr. Googe also acknowledged a document written by Ms. Shettles after her interview of the Petitioner in which Ms. Shettles wrote, "To say that Mr. Morris was verbal would be a great understatement." In the document, Ms Shettles continued, "Not only was Mr. Morris' eye contact intense, he often gave the impression as he spoke, that he was 'losing control.'" In response to this statement, Mr. Googe stated that he did not necessarily agree that the Petitioner was losing control. Notwithstanding, he did agree with Ms. Shettles observation that the Petitioner would often "misuse" various words in an effort to demonstrate his vocabulary. Mr. Googe stated that he was aware that the Petitioner had reported that his maternal grandfather committed suicide. Mr. Googe related that the Petitioner had suicidal thoughts and was trying to kill himself when this crime occurred.

Ms. Shettles' report indicated that the Petitioner had joined the Army and had applied for training in motor transport. The report indicated that this assignment was unavailable and the Petitioner was assigned as a radio teletype operator. After eight or nine months, the Petitioner was discharged from the Army. The report further indicated that the Petitioner had "no male friends because of his natural distrust and his lifestyle." Most of the Petitioner's "friends" were "employers, people he worked with, and things of this nature." The Petitioner reported that "at times his co-workers and employers 'feared' him. [The Petitioner] stated his employers were not used to a black man 'speaking out' in the manner [he] did, and on one occasion 'they fired him.'" Ms. Shettles' report recommended that the defense team obtain a "neural pharmacologist" and stated that the Petitioner is "kind of manic depressant."

Mr. Googe acknowledged that, three months prior to the trial, Ms. Shettles expressed concern to co-counsel regarding the Petitioner's demeanor and remarked that "he has a screw loose, may be manic depressant." Another memorandum from Ms. Shettles noted that it was her opinion that the Petitioner was not aware of his "unusual characteristics with regard to others' perceptions of him."

Mr. Googe recalled that the Petitioner informed them that he had been involved in a car accident at some point. Mr. Googe did not recall the Petitioner indicating that there was any residual problem from it. Notwithstanding, another document was produced in Mr. Googe's handwriting discussing the car accident and the fact that the Petitioner had been shot twice, once in the leg and once in the back, and also the fact that the Petitioner had been clubbed in the back of the head with a .38 pistol. More information regarding the car accident indicated that the event occurred in St. Louis and that, during the accident, the Petitioner's face hit the corner of a seat and the Petitioner had some teeth knocked out as a result. A document written by Mr. Taylor indicated that the Petitioner had been involved in five major car accidents.

Mr. Googe commented that he was aware the Petitioner "used a good bit of" alcohol. However, Mr. Googe stated that the Petitioner's biggest problem was crack cocaine. When confronted with a statement by Jack Thomas, the Petitioner's co-worker, stating that the Petitioner had a drinking problem but "no drug problem," Mr. Googe commented that Mr. Thomas' statement was inaccurate.

Regarding a mitigation theory, Mr. Googe testified that

this crime was out of character for the defendant. It was done because he was on crack cocaine and coming down with a withdrawal with all the symptoms that make someone act in an out of character abnormal fashion. People will have physical reactions and act a lot differently when they're on crack cocaine and that he was a good worker. He had a good work history there when he was working as a grave digger and this sort of thing. That he would adapt well to a correctional setting. Kind of a lack of future dangerousness. And accepting responsibility – he did confess to the crime. He decided that during the crime – he was on a spree and then decided to let the third victim live and let her go when he could have easily gone on and killed her and eliminated the only eyewitness to the crime.

On cross-examination, Mr. Googe testified that, in preparing the defense, the defense team had full discovery and they were able to procure all of the police reports and statements of witnesses. Although Mr. Googe did have a problem with contacting Dr. Smith, he finally made contact with Dr. Smith and talked with him "at length" about his testimony. Ms. Shettles was retained as a mitigation specialist, and Dr. Parker and Dr. Bernet were retained to explore any mental issues. Mr. Googe testified that he studied up on death penalty cases and procedures in preparation for the case. Mr. Googe commented that the only surprise at trial was Angela Ragland's testimony regarding the length of time between the stabbing of Erica Hurd and when Erica Hurd stopped breathing. Although the Petitioner's wife indicated that the Petitioner had "some type of mental disorder," her

comments further indicated that his mood swings and behavior only changed after he started using drugs.

Mr. Googe related that the theory of defense was "diminished capacity" due to the ingestion of a large amount of crack cocaine. The Petitioner's testimony, the testimony of Angela Ragland, and the testimony of the Petitioner's brother supported this defense. Another witness, who could have further verified the Petitioner's ingestion of crack cocaine, refused to cooperate. Mr. Googe testified that the Petitioner used approximately $500.00 of cocaine within a twenty-four-hour period. He added that the Petitioner, upset about a rape charge, was attempting to overdose on cocaine. Mr. Googe further related that Dr. Drewery failed to diagnose the Petitioner with any mental illness. Another psychiatrist, Dr. Bernet, concluded that "a defendant because of ingestion of crack cocaine may have lacked the ability to form premeditation." Dr. Bernet, however, gave no indication of "any manic-depressive state."

Mr. Googe testified that a motion to change venue was filed in response to the "uproar in the community over this crime and a lot of publicity." The motion was denied but kept open to the extent that, if an impartial jury could not be seated, then it would be reconsidered. Mr. Googe stated that the Petitioner was advised of all trial tactics. With regard to the all-Caucasian jury, Mr. Googe explained that much of the outrage regarding this crime came from the African-American community. Mr. Googe stated that an objection was made to one African-American juror being recused and that issue "may have [been] raised . . . on the appeal."

Mr. Googe commented that he could not think of any motions he could have filed that would have made a difference. He stated that there was nothing in the reports of the experts that would have led him to pursue investigation into bipolar disorder. Mr. Googe related that there were many beneficial mitigating circumstances evident in the Petitioner's background, as well as many harmful factors.

Daniel Taylor testified that, in July 1993, he accepted a position as an Assistant Public Defender for the Twenty-Sixth Judicial District. At the time of the Petitioner's trial, he had been an assistant public defender for five and one-half years. Mr. Taylor stated that his usual caseload at that time was approximately ten to twenty cases per week in city court and approximately thirty to fifty pending cases in circuit court. Approximately sixty percent of the cases were felonies and forty percent were misdemeanors. Mr. Taylor testified that the Petitioner's case was his twenty-fifth jury trial. He added that the Petitioner's case was his first death penalty trial. In preparation for the Petitioner's trial, Mr. Taylor reviewed the TACDL Death Penalty Manual and attended capital defense seminars. Mr. Taylor also made contact with David Keefe with the Capital Division. Mr. Keefe provided a "disk of motions." Both Mr. Taylor and Mr. Googe talked with Mr. Keefe several times prior to the trial.

Mr. Taylor first met the Petitioner at the Madison County Jail sometime after the preliminary hearing. Mr. Taylor confirmed that the first meeting occurred on November 21, 1994. He described the Petitioner as "excited" and "very animated" during this first meeting. He recalled that the Petitioner talked very loud and was boisterous, although he was not disrespectful. Mr. Taylor stated

that the Petitioner did not really want to discuss the facts of his case. Both Mr. Taylor and Mr. Googe informed the Petitioner about the possibility of charges and the penalty range. The Petitioner was interested in talking about getting out of jail. Particularly, the Petitioner was not satisfied with the "arrangements at the jail."

Mr. Taylor confirmed that the defense team obtained the services of Glori Shettles, a mitigation specialist with Inquisitor, Inc. Ms. Shettles' role in the trial preparation "expanded over time." She was to "do a life history and to sort of go back and examine – talk to different individuals to do a mitigation – to serve as mitigation proof or possible evidence of mitigation proof." Ms. Shettles was also to assist in jury selection.

Mr. Taylor described the security during the Petitioner's trial as "pretty extensive." The defense team expressed concerns about the number of officers in the courtroom. Mr. Taylor recalled that the Petitioner did not have visible "chains on him" during the guilt phase of the trial and that the Petitioner had paper and pencil. Mr. Taylor commented that the Petitioner "was drawing pretty much during – almost during the entire trial." He stated that the trial court indicated that "because there was a conviction that during the sentencing phase that the court – you know, they put leg restraints on him that were visible." Mr. Taylor could not specifically recall the presence of hand restraints but stated that it was possible.

Mr. Taylor stated that it was his recollection an attempt was made to get the Petitioner's military records, but he could not recall ever seeing them. Mr. Taylor characterized himself as the "day to day keeper of the file." In this role, Mr. Taylor would discuss things with Mr. Googe and Ms. Shettles, and then he would call different individuals and arrange for appointments. Mr. Taylor further stated that they had the services of two investigators, who were basically fact-based investigators and not mitigation specialists.

Mr. Taylor testified that the services of Dr. Robert Parker, a pharmacologist, were procured by the defense team. Dr. Parker's role was to discuss the effects of drugs, specifically cocaine, on a person from the time the person ingested these drugs through the time that they were out of their system. Dr. Parker was to testify at the motion to suppress to the fact that cocaine could have affected the Petitioner's judgment and reasoning ability. Additionally, Dr. Parker was to testify regarding the Petitioner's ability to premeditate the murder. Mr. Taylor conceded that Dr. Parker was more of an "educational witness about the effects of cocaine."

Dr. Bernet was retained to evaluate the Petitioner as to any general mental issue and also to look at the issue about premeditation and the effect of drug use on the premeditation issue. Mr. Taylor first met with Dr. Bernet on January 10, 1996. During his initial meeting with Dr. Bernet, Mr. Taylor expressed his concerns regarding competency and premeditation. Mr. Taylor was also aware of the Petitioner's use of alcohol. However, Mr. Taylor was not of the opinion that the Petitioner was an alcoholic. He stated that an interview of the Petitioner's wife, conducted by an investigator, revealed her concerns that the Petitioner suffered from some type of mental disorder,

-13-

indicating that he had "severe mood swings and was easily excited along with a very bad temper." Mr. Taylor stated that Karen Morris' statements could have been an indication of mental disease or disorder. However, Karen Morris' observations were made after the Petitioner started using drugs.

Mr. Taylor agreed with Ms. Shettles' observations that the Petitioner was "verbal," interpreting this as the Petitioner "talks a whole lot." He also acknowledged Ms. Shettles' recommendation for a neuropharmacologist approximately nine months prior to trial. After this recommendation, the defense team obtained the services of Dr. Parker, a pharmacologist. They also obtained the services of Dr. Bernet, a psychiatrist. Mr. Taylor could not recall any IQ test administered to the Petitioner. On October 16, 1996, Ms. Shettles indicated some concerns regarding the Petitioner's courtroom demeanor. Ms. Shettles stated that the Petitioner "has a screw loose, may be manic depressant." Mr. Taylor stated that Dr. Bernet may have been furnished with some of the information from the Petitioner's interviews. However, Dr. Bernet would not have been apprised of Mr. Taylor's personal notes, although Mr. Taylor expressed his concerns to Dr. Berent.

Mr. Taylor stated that

the theory of defense was somewhat limited because of his statements and some of the evidence. But the theory of the case was that he was under the influence of cocaine and the effect that it had on him and his judgment and also his culpable mental state and that Mr. Ragland kind of – there was an argument in which because of his influence that led to these charges.

On cross-examination, Mr. Taylor conceded that the amount of cocaine consumed by the Petitioner, $500.00 worth, was a significant amount. He admitted that Dr. Bernet was retained to determine any general mental defects and that Dr. Parker was hired to discuss the effects of cocaine.

Jesse H. Ford, III, an attorney in private practice, testified that he was appointed in a "consultant type role." He explained that he "would talk about trial strategy and things of that nature. Brainstorming sessions." Mr. Ford stated that this was his first capital case. He further explained that his role was pretty much limited to the guilt phase of the trial. Notwithstanding, Mr. Ford stated that he "sat in on a lot of sessions on mitigation with Ms. Shettles." Mr. Ford indicated an initial desire to work toward a plea agreement; however, he noted that the District Attorney was not inclined to work on a deal, so it was not an option in this case. Mr. Ford stated that he was involved at the penalty phase only because Mr. Googe had come down with laryngitis and asked him to step in.

Mr. Ford stated that he talked with the Petitioner on numerous occasions. He stated that, based upon the evaluation of Dr. Bernet and Dr. Drewery, he did not feel any need for further mental

evaluations of the Petitioner. On cross-examination, Mr. Ford opined that the State's case against the Petitioner was very strong.

Glori Shettles, a private investigator with Inquisitor, Inc., testified that she began working on the Petitioner's case in February 1996. At this time, Ms. Shettles had been employed by Inquisitor, Inc. for three years. Ms. Shettles' background was in social work, and she had previously been employed as an investigator by the Shelby County District Attorney's Office and as a parole officer. In preparation for mitigation work for capital cases, Ms. Shettles attended capital case seminars. At the time of her involvement in the Petitioner's case, she had been involved in several cases "but a lot of them were limited." She added that, at this point in her career, she generally did what the attorneys asked her to do.

In describing the role of a mitigation specialist, Ms. Shettles stated that the mitigation specialist "could help the attorney in preparing a social history and to identify factors in the background or situation that may require experts." She further explained that, in conducting a "social history investigation[,]" she would interview family members, collateral witnesses, and persons that could give information. She also would review records, obtain records, and prepare a report. Ms. Shettles later defined "collateral witnesses" as "[s]chool teachers, friends, co-workers, neighbors." She explained that interviews of "collateral witnesses" were important because "other people have different perspectives and can give information outside the immediate family. They may have observed situations and things about the family members or the interaction or the client's interaction that family members might not either be willing to talk about or may not be aware of." Ms. Shettles explained that the "more information you have from people, just the more thorough your history will be."

Ms. Shettles testified that the starting point in determining whom to interview would be from information from the client. She stated that, ideally, interviews should be conducted in person. She added that it was important that the person trusted you so that they were willing to give you information. Ms. Shettles stated that it often took several visits before that trust was established. She explained that some of the information was not only "painful" but often embarrassing. Ms. Shettles explained that only about "[f]ive percent" of essential information is garnered through telephone conversations.

Ms. Shettles stated that she interviewed the Petitioner's mother and a brother. She interviewed other family members that lived in St. Louis and one brother who lived in Virginia. She added that these interviews were completed by telephone. The interview of the Petitioner's mother and brother were together, which she stated was not an ideal situation. Ms. Shettles stated that Chauncey Morris lived in Virginia and was the most successful of the Morris children. Chauncey Morris had distanced himself from his family. Ms. Shettles stated that she never interviewed the Petitioner's wife, Karen Morris.

Ms. Shettles agreed that "part of the mitigation specialist's job is identifying factors in the client's background or situation that require expert evaluations," such as "[m]ental retardation[,] [m]ental illness[,] [o]rganic problems[,] [h]ead injuries[,]" and "[p]ossible neurological problems."

-15-

She testified that an investigation does not stop just because records and interviews with the client fail to indicate that he has never been treated for a psychiatric or psychological illness. Ms. Shettles testified that certain mental illnesses are genetic, and this warrants a thorough familial investigation. In order to "ferret out" possible mental illnesses, "you can be specific with people in talking about behaviors and the situations of when behaviors occurred and what was going on around that time." Ms. Shettles added that "a time line of events or stressors in that person's life" would also be beneficial.

Ms. Shettles further testified that part of her function as a mitigation specialist was not only to determine what experts would be needed, but also to be able to provide the appropriate background materials and information to these experts to enable them to perform competent and reliable evaluations. In this regard, she stated that the majority of the experts would like to have facts about the crime itself and they want interviews with the client's family. Ms. Shettles stated that she could also assist the defense team in developing a trial strategy and theory of the case. In this regard, she stated that she was able to make suggestions about witnesses.

Regarding her function in the present case, Ms. Shettles described her role as "not very proactive." A timeline was completed by Danese Banks, another investigator with Inquisitor. In reviewing the timeline, Ms. Shettles remarked that "very little" time was devoted to Petitioner's social background or social history. There were no birth records, no pediatric records, and minimal school records. Ms. Shettles related that these records were important because factors present during pregnancy and during birth could result in a number of medical problems. She stated that she only received minimal academic records on the Petitioner and she could not recall any follow-up being done, for example interviewing former teachers. Ms. Shettles further stated that she did not obtain the Petitioner's military records, although this is something she would normally acquire. She testified that the only reasons why she would not have sought these records were (1) the cost of the records and (2) the length of time it would take to obtain the records. Ms. Shettles further conceded that there was no information obtained providing any insight as to why the Petitioner began using drugs. Ms. Shettles recalled that the defense attorneys were concerned about the cost of her investigation. Ms. Shettles stated that, had she been investigating this case today, she would have sought out more information.

In describing the Petitioner, Ms. Shettles stated that the Petitioner was "agitated a lot." She stated that he was "[v]ery loud at times. Unable to control his arms." For these reasons, Ms. Shettles participated at the trial in order to keep the Petitioner under control. Ms. Shettles agreed that the Petitioner was not dangerous, although his demeanor may have given that appearance to the jury. She stated that the Petitioner was very verbal and that he talked incessantly. She described that "[i]t was very difficult for him to focus." Regarding her recommendation that the defense team obtain the services of a neuropharmacologist and her statement that the Petitioner appeared "manic depressant," Ms. Shettles explained that these recommendations were made based upon the Petitioner's behavior as she had observed and not based upon any records.

As to the Petitioner's trial, Ms. Shettles testified, "I believe that he was shackled – his feet during the voir dire. That was in a . . . different room, and we were at the back of the room . . . . I don't recall [the Petitioner] being shackled during the trial that would be visible until the time he was sentenced – found guilty." She stated that "[t]o the best of my knowledge – memory" he was shackled during sentencing. Ms. Shettles stated that, during the guilt phase, the Petitioner spent time drawing and writing with a pencil. The drawings were of unhappy people, but she did not describe the drawings as menacing. She stated that, to the best of her recollection, the Petitioner was unable to draw and write during the penalty phase of the trial. She also recalled being asked to "move back, which would have been to a bench behind the table and that the pencil and the pad was taken away at that time."

Dr. Pamela Auble, a psychologist with a specialty in neuropsychology, explained that "neuropsychology" is a "sub-specialty of Clinical Psychology that involves brain behavior relationships." The Petitioner's post-conviction counsel retained the services of Dr. Auble for the purpose of administering standardized testing to the Petitioner and to evaluate him to determine his functioning level and whether there was any evidence of cognitive deficits or mental defects. In completing her evaluation, Dr. Auble met with the Petitioner on three occasions, February 25 and 26, 2002, and March 5, 2002. She spent a total ten and one-half hours with the Petitioner, during which time she administered a number of standardized tests. In a report written March 14, 2002, Dr. Auble reported that there was no evidence the Petitioner was malingering on the tests. The report further revealed that the Petitioner hade "some impairments in the – on the testing." Specifically, Dr. Auble reported that the "Halstead Impairment Index was in the mild range of impairment although it really – that doesn't really describe it very well because, in fact, he was normal on some things and impaired in other things." Dr. Auble explained that the testing revealed that the majority of his impairment was in memory, but that the Petitioner also "had some difficulties in his motor skills with his left hand, and he had some mild and variable impairments in abstract reasoning, in mental flexibility, and in concentration and attention."

Dr. Auble reported that the Petitioner had an I.Q. of 90, which is in the lower portion of the normal range. However, in light of this IQ, his memory score is "quite deficient." She further reported that the Petitioner had "some particular difficulty in inhibiting his responses." Dr. Auble stated that "[t]his is the kind of thing that you can see in an individual who has frontal lobe damage. It's also the kind of thing that you can see in somebody with a psychiatric problem or psychiatric difficulties." She explained that "mood disorders and things of that nature do disrupt attention and concentration and that you get this same kind of variable pattern." Dr. Auble testified that she was unable to distinguish between frontal lobe damage and a mood disorder, which could be depression, bipolar disorders, or dysthymia.

Although Dr. Auble never made a formal diagnosis of the Petitioner, her report indicated that "the testing [of the Petitioner] did show abnormalities, and it did indicate some brain malfunctioning of some sort." Dr. Auble further related that the Petitioner had informed her of "a number of accidents and injuries, some of which included blows to his head." She also related a history of early chemical dependency. These facts were consistent with the testing results which were "more focal than diffuse." In other words, the Petitioner's deficiencies were more consistent with head

injuries rather than damage from chemicals or drugs. Dr. Auble corroborated the opinion of others by stating that the Petitioner "talks a lot, and he talks fast and in great quantity."

Although Dr. Auble did not perform any personality testing of the Petitioner, she was able to review the work of Dr. Walker. Dr. Walker's reports also indicated no malingering by the Petitioner, that is, the Petitioner was not faking emotional problems. Dr. Auble explained that the tests administered by Dr. Walker were "both self-report inventories." She further stated that a person's "emotional states" were, by nature, variable. Thus, one's results on certain personality tests depended on the person the day that they were actually tested.

Dr. Auble related that "one of the things that was present throughout the personality testing was a tendency to be a little bit paranoid . . . ." She stated that the Petitioner was "likely to be suspicious of other people, skeptical about relationships." The Petitioner was also "up on persecutory ideas," indicating "some distrust of other people." It appeared to Dr. Auble that the Petitioner had "always been suspicious of other people, mistrustful, a little bit on the paranoid side." Dr. Auble testified, that in order to make a diagnosis of bipolar disorder, one had to look not only at tests but also at the person's history.

On cross-examination, Dr. Auble conceded that she was an associate member of TACDL, an association that represents criminal defendants. As a member, she is on their committee for experts. Dr. Auble denied that she had manipulated data in the Perry Cribbs case in order to report a lower IQ. When confronted that a State witness in the Perry Cribbs case had testified that Dr. Auble's "methods were unprofessional if not unethical," Dr. Auble denied any wrong doing, stating that she "never manipulated the data or reported his IQ as anything other than what it was." Dr. Auble was further confronted with her testimony in the matter of Jon Hall during which she stated that she did not follow the guidelines set out in the Diagnostic Statistic Manual. She refuted the statement that she did not follow the guidelines. Dr. Auble further acknowledged discrepancies in the Petitioner's statement to her regarding the crime and his statement provided soon after the crime. She explained that, in her opinion, the statements were not that different and that some of the differences in the details may have been the result of memory. She further stated that the Petitioner had a "tendency to minimize problems and to portray himself as a good person." While refusing to admit that the Petitioner could have been lying, Dr. Auble stated that it was possible that "he is reporting something that is more palatable, easier for him to live with."

Dr. Murray Smith is the medical director at New Life Lodge, an alcohol and drug treatment center in Burns, Tennessee. Dr. Smith was qualified as an expert in the area of medical addiction. He stated that, in his career, he had treated probably a total of twelve thousand addicts and between two and three thousand cocaine addicts. Dr. Smith testified that, "[i]n terms of addiction medicine, we want to know about the whole path that brought the person to the drugs. We go through the family history because we know that addiction is strongly genetic." He further related that it was important to determine whether there were any underlying medical or mental health issues.

He testified that he was appointed to do an addiction medicine evaluation of the Petitioner. In preparing his evaluation, Dr. Smith obtained numerous documents including trial transcripts, Dr.

Auble's evaluation, and statements of family and friends of the Petitioner. He also obtained the transcripts of the testimony of Dr. Bernet, Dr. Parker, and Dr. O.C. Smith. Dr. Smith also met personally with the Petitioner. He related, as had other witnesses, that the Petitioner was very talkative.

During his interviews with the Petitioner, Dr. Smith learned that the Petitioner had been accused of rape of another woman prior to the commission of the homicides. The Petitioner described this accusation as false and that the accusation caused him emotional distress. As a result, the Petitioner purchased $250.00 worth of cocaine, an amount that the Petitioner felt would be sufficient to kill himself. At about noon on that Friday, the Petitioner began smoking the cocaine and did so until about one o'clock in the morning. Dr. Smith opined that the rate of usage was about $20.00 every hour, "which is pretty . . . standard for a cocaine binge." Dr. Smith related that "[o]n a cocaine binge, they may smoke $1,000.00 to $2,000.00 over a long weekend." The Petitioner informed Dr. Smith that, during this time of usage, "he could feel like he saw people out in the darkness." The Petitioner added that "then his neighbor, Mr. Ragland, came by, and they had both a verbal and a physical confrontation conflict." The Petitioner reported that Charles Ragland commented, "You're dead." The Petitioner interpreted this as Ragland's intent to kill him. The Petitioner further believed that Mr. Ragland was a "crack head" and a crack dealer, who was capable of not only killing him but his entire family. At this point, the Petitioner determined that he had to kill Charles Ragland.

Dr. Smith reported that a person using cocaine would "get a rush for about fifteen minutes." Then, after about an hour, the effect starts wearing down; they start craving cocaine again; and they have a tremendous desire to replace the cocaine. Dr. Smith stated that the Petitioner probably believed that Charles Ragland had crack cocaine and "it was like life or death at that point to get the cocaine."

Dr. Smith compared his analysis to that of Dr. Parker, stating that, while Dr. Parker described the way cocaine operates in the system or the dynamics of the drug itself, he examined the dynamics of the drug in the particular person. Dr. Smith testified that, if the Petitioner had last ingested cocaine at one o'clock in the morning, any affect "should have worn off very much" by six o'clock in the morning. Dr. Smith was as perplexed as Dr. Bernet was at trial at the Petitioner's irrational behavior at six o'clock in the morning. He attributed the behavior to causes other than the cocaine. At this point, Dr. Smith suggested that one needed to look for a dual diagnosis.

In support of a dual diagnosis, Dr. Smith pointed to several indicators, including the Petitioner's high opinion of himself and intolerance for lack of respect. The Petitioner also related this "hypersexuality," discussing that he had numerous sexual partners in addition to his wife and girlfriend. The Petitioner "was easily distracted." Dr. Smith further related that the Petitioner "was very proud of what he said was the fact that he didn't have to sleep very much . . . ." The Petitioner also wrote "scholarly type work" about "racial conflicts in the United States" and poetry. During his second visit with the Petitioner, Dr. Smith was able to review some of the Petitioner's writings. Dr. Smith testified that, in his opinion, the Petitioner's poetry "was actually very good." The other writing appeared to be several years old. This writing was "maybe a half a dozen pages. It was very

disorganized and was at at least a fourth or a fifth grade level . . . ." This writing was about "[r]acial conflict and that sort of thing."

Dr. Smith related that addicts are "three times more likely to have bipolar illness than the ordinary population." In this regard, Dr. Smith noted that he was always on alert for bipolar disorder. He also observed that the Petitioner was "revealing . . . some of the very points that are part of the diagnostic criteria for bipolar, the most common of which is the decreased need for sleep and the grandiosity and the irritability and the distractibility." Dr. Smith stated that "[f]or a bipolar person, it's like their brain is on fire and the cocaine increases the fire . . . it greatly increases the hyperactivity, the racing thoughts, the sensation of being driven, the staying awake." Dr. Smith opined that

> it seemed to me very clear that there was evidence of frontal lobe dysfunction. The scholarly writing . . . requires a very intact frontal lobe whereas poetry requires very little frontal lobe function. And all of the characteristics that he had that were highly suspicious of bipolar, . . . and in his case, I would certainly recommend a psychiatrist evaluation.

He added that the Petitioner "met the criteria for the DSM-IV-R criteria for cocaine induced psychosis." Dr. Smith explained that the "criteria for that are excess symptoms beyond the normal symptoms of intoxication with cocaine and a type of psychosis that would require treatment even if there wasn't an intoxication." In the present case, the Petitioner "had a fixed delusion," that is, that "killing the man made sense." Dr. Smith qualified this delusion as psychotic.

Regarding the surviving victim Angela Ragland's behavior, Dr. Smith characterized her actions as what "a very wise human being would have done, and that is she remained calm after seeing Erica become hysterical and lose her life." He continued that "for a man that has the grandiosity and the feeling of power that Mr. Morris has from his bipolar felt like that . . . calmness was acceptance of the sex as something good for her." Dr. Smith stated that, had the Petitioner just been under the influence of cocaine, one would not expect the Petitioner to maintain his delusions. In this regard, Dr. Smith related that, had the Petitioner just been under the influence of cocaine, he would not still be telling the psychologist that "[i]t was right to kill this individual, and I was having consensual sex with his wife . . . ." This statement is characteristic of "psychosis."

Dr. Smith commented that Dr. Parker's testimony at trial relating that the Petitioner was under the influence of cocaine during his encounter with Angela Ragland was an attempt to "make sense out of it just as the other people were trying to make sense out of it by saying it was intoxication." He criticized Dr. Parker's analysis, stating that "[the Petitioner] was still psychotic and still irrational and that the psychosis was why he was so hyper and why he was in that excitable state." Dr. Smith added that the Petitioner's actions and the signs and symptoms displayed "are far in excess of what an intoxication would do."

On cross-examination, Dr. Smith defined bipolar disorder as follows:

[A]n effective disorder – a mood disorder characterized by expansive mood where he feels like he's super, where he's grandiose. Often times the most common characteristic is decreased need for sleep where there's often times hypersexuality as [the Petitioner] presented, that there's distractibility as [the Petitioner] presented, that there's chemical dependency which [the Petitioner] presented, and that there's task driven behavior, that is, if he's got a focus to do he will stay with it. One of my patients wrote like a hundred letters to the President in one night.

Dr. Smith further delineated "Bipolar I and Bipolar II." He stated that the two are "differentiated by whether it's manic episodes or hypomanic episodes or whether it's primary depressed episodes." Dr. Smith stated that "primarily most of the time [the Petitioner is] hypomanic" and that the "most recent episode involving the crime was manic." Dr. Smith qualified his responses by stating that his job was to look for the symptoms and then "ask for help."

In support of his diagnosis of the Petitioner, Dr. Smith cited to the Petitioner's employment record and to the fact that he could not keep a job for very long due to his irritability and mood swings. He further pointed to the Petitioner's ability to "do a prodigious amount of grave digging because he was on his own, he wasn't distracted." Dr. Smith also relied upon the Petitioner's self-reports of drinking beer to medicate himself while he was digging graves. Besides the events of the crime, Dr. Smith stated, "I think he was hypomanic most of the time based on what he told me and based on the statements from his friends and relatives."

The prosecutor then read the following diagnostic criteria for a hypomanic episode: "[A] distinct period of persistently elevated, expansive, or irritable mood, lasting throughout at least four days, that is clearly different from the usual nondepressed mood." Dr. Smith stated that the Petitioner exhibited these findings during both of his visits with the Petitioner in 2002. Dr. Smith also relied upon statements from the Petitioner's family and friends to define these findings before the crime. Dr. Smith also relied upon a report by the Petitioner's "sister who worked with him in a psychiatric hospital said that there was no question in her mind that he was bipolar because she watched him behave in those ways." This report was before he arrived in Jackson, sometime between 1980 and 1985.

The prosecutor, relying upon the DSM-IV's requirement that "[t]he episode is associated with an unequivocal change in functioning that is uncharacteristic of the person when not symptomatic," also questioned Dr. Smith as to whether he had eliminated the Petitioner's behavior was part of his "normal characteristics." Dr. Smith responded that "[t]he answer is the family reported cycles of mood changes." While Dr. Smith acknowledged that the family's reports failed to provide dates and information regarding whether the symptoms were displayed contemporaneously, he stated that the family members were not experts and their reports of mood swings were consistent. Dr. Smith further stated that, although the reports did not indicate mood swings within a period of four days as required by the DSM-IV, the reported mood swings did last

more than just a few hours or a few minutes. He conceded that the Petitioner had never been hospitalized as a result of any of these reported episodes.

Dr. Smith further conceded that, in order to make a diagnosis of a hypomanic episode, there has to be an elimination of the effects of any substance abuse. He admitted that the Petitioner had a history of PCP use, marijuana use, alcohol use, and cocaine use. Dr. Smith stated that he could not eliminate the effects of any intoxicant in these specific events "because [he was] not reporting it. However, my observation in the prison was accurate, and he was not on any alcohol or drugs in the prison." The Petitioner's behavior in prison, that is the fact that, he was "very talkative," he was "restless," his lack of need for sleep, and his hypersexuality, supported a diagnosis of hypomanic.

Dr. Smith admitted that "bipolar" involved the cycling of mania and depression and that he had not observed the depression cycle from the Petitioner. He further testified that paranoia may also account for the Petitioner's irritability and conceded that paranoia was an effect of cocaine. He stated that a person that was paranoid may have delusions. He conceded that cocaine would enhance one's paranoia. While he acknowledged that the Petitioner was paranoid, Dr. Smith maintained that many other criteria were present. Dr. Smith, refuting the proposition that the Petitioner's actions were the result of his ingestion of an exorbitant amount of cocaine, stated that he believed that the "cocaine took his hypomania and turned it into mania and into a psychotic condition." In effect, the cocaine "acted upon the pre-existing illness." And, while there was no direct evidence that the Petitioner had met all the criteria of bipolar disorder before the incident, Dr. Smith maintained that his diagnosis was "[b]ased on [his] experience and training and the fact that this is what I do in taking care of patients for the last fourteen years."

Regarding the events of the crime, Dr. Smith conceded that the Petitioner was able to premeditate. Notwithstanding, Dr. Smith stated that the Petitioner "was delusional. He believed that this was the right thing." Dr. Smith conceded that, if a mental health professional had determined that the Petitioner's substance abuse was the cause of the action, the diagnosis of bipolar disorder would not be made. Although Dr. Bernet testified that "he felt that it was the effects of the cocaine is what caused Mr. Morris to do what he did," Dr. Smith disagreed with this statement.

Dr. George Woods, a specialist in neuropsychiatry, was contacted by the Post-Conviction Defender to evaluate the Petitioner. Dr. Woods testified that he interviewed the Petitioner in February 2002. He also reviewed the testimony of Dr. Bernet and Dr. Parker as well as reviewing "other psychological and psychiatric evaluations that primarily pertained to competency that were done a short time after [the Petitioner's] arrest." Dr. Woods reviewed the neuropsychological testing of Dr. Auble, the chemical dependency evaluation of Dr. Smith, and the psychometric testing of Dr. Walker. Finally, Dr. Woods reviewed affidavits of family members and friends of the Petitioner, school records, military records, and other relevant records. Based upon his evaluation of the Petitioner, Dr. Woods concluded that the Petitioner suffers from a bipolar illness.

Dr. Woods explained that the bipolar disorder, also known as manic-depressive disorder, is a genetically transmitted disorder. He continued:

Bipolar Disorder is a mood disorder . . . . [T]he idea that there is a classic Bipolar Disorder that presents itself with phases of mania and phases of depression in some type of cyclical fashion is simplistic and incorrect. What you really see in Bipolar Disorder is really a myriad of presentations – manic symptoms, hypomanic symptoms, what we call euthymic symptoms which are pretty much . . . normal, and depressive symptoms. A person could stay in mania their entire life. A person could stay in hypomania their entire life. And the Diagnostic and Statistical Manual is merely a classification system. It's hardly a comprehensive discussion of Bipolar Disorder. It's really a system that is designed . . . to increase what's called interrator reliability so that different mental health people can kind of talk about their diagnoses in the same language. But it is hardly a compendium of any – of any of the disorders, and it speaks of that. A Bipolar Disorder is reflected by changes in moods. Typically, you have depression. You have mania. You can well have hypomania.

Dr. Woods further stated as follows:

There is no period that you have to have for a significant – for example, you can have one manic episode in your life, and it can be a Bipolar Disorder unless that manic episode was caused by some drug. Some antidepressants, for example, cause mania.

What we have here is that we have Dr. Walker's testing, which notes there may be some transient depressive symptoms. We have several indications by Dr. Smith and others that [the Petitioner] may have had suicidal ideations prior to the event. We also have a significant history of [the Petitioner] self-medicating. And self-medication . . . can be both self-medication of depression as well as of mania. It's important to note that mania itself is a manifestation of depression, so mania is not something separate from depression. . . . And often mania is driven from a depressive state. So, mania isn't the absence of depression. The idea that . . . mania is somehow separate from depression is inaccurate. . . . An often very depressing situation will drive people into their first manic episode. . . .

So, then you have what's called hypomania . . . . [T]he criteria for hypomania are really the very same as the criteria for mania except you don't have delusions and hallucinations. And, so, in . . . hypomania, you'll have problems with sleeping. You'll have distractibility. You'll have racing thoughts. You'll have either pressured speech or rapid speech, loud speech.

Dr. Woods added that, in order to make a proper diagnosis of hypomania, one needs to talk to friends and acquaintances as hypomania can look "very, very normal."

Regarding the Petitioner, Dr. Woods stated that there was evidence of depressed states, but that the "[Petitioner] is someone that clearly historically has sat in a hypomanic state" and the "idea of him returning to a 'normal state' is not consistent with what we know about the epidemiology of

mania." Dr. Woods summarized Bipolar Disorder as "[y]ou've got hypomania which is intrusiveness, hyperactivity, hypersexuality, psychomotor focus, impaired judgment. But you don't have the hallucinations, and you don't have the psychoses. And then you have mania. And mania is the point at which you become at most times psychotic."

Dr. Woods also reviewed the Petitioner's military records. These records revealed that the Petitioner received an honorable discharge but was ineligible for veteran's benefits and was not allowed to re-enlist. The records indicated that the Petitioner had a contract for radio operator's school. The Petitioner was placed in the Trainee Discharge Program, which allowed him to be discharged with less than six months of service. The Petitioner began exhibiting problems in the seventh week of specialized training. The records contradict the Petitioner's self-report of his military experience. The Petitioner reported that he left the service because he was not able to get the training that he had asked for. In actuality, the Petitioner did receive the contracted training but began having difficulties within the service and was discharged. While he could not say for certain that this behavior was an "exhortation of someone that his hypomanic," it could very well be.

Dr. Woods related that the Petitioner's sister, Phyllis Morris Jones, stated that the Petitioner always talked fast and was always animated when he talked. Ms. Jones further confirmed that the Petitioner was "very moody at a period of time in his twenties when she believed he was doing drugs . . . ." Dr. Woods also felt it significant that the Petitioner's maternal grandfather committed suicide. A friend of the Petitioner, Michael Harris, reported that the Petitioner would "talk more" and "talk faster" when he "would drink." Mr. Harris also described the Petitioner as "high strung and hyper." Notwithstanding, he characterized the Petitioner as popular. Dr. Woods stated that hypomanics "are known to be infectious."

Dr. Woods also relied upon the affidavit of Gregory Longmeyer, a friend of the Petitioner's during his military service. Mr. Longmeyer also stated that the Petitioner talked "very fast" and talked "a lot." A paternal aunt of the Petitioner, Flossie Mayes, related that the Petitioner's mother was "very strange." Ms. Mayes stated that "[y]ou never could tell what mood [the Petitioner's mother] would be in when you saw her." She further related that the Petitioner's mother "cheated on my brother." Notwithstanding, Ms. Mayes stated that "it was also clear that . . . my brother also cheated on Lovetta." The Petitioner's nephew, David Morris, related his grandmother's unusual behavior, noting that she would wear the same sweater for weeks. Donna Marie Owens, "the sister of his first child's mother," related that the Petitioner talked a lot. She added, "He talked some about his drug use. He talks about his son having periods of depression. When he is in this state, he becomes very agitated. He paces and rambles on about his problems and that his father, Farris Morris, displayed the same behavior." Dr. Woods found this information very relevant since the "psychiatric literature is very clear that African-Americans typically have a much different presentation of mood disorders . . . . African Americans often will become much more paranoid when presenting with mood disorders. They also have what are called more agitated depressions rather than melancholy depressions."

The next affidavit was that of James Kevin Stevens, the Petitioner's stepson. Mr. Stevens noted that the Petitioner was very moody. Mr. Stevens likened the Petitioner's behavior to that of

the Petitioner's mother, who was also described as a very moody person. Anita Louise Owens Stewart, the mother of the Petitioner's first child, stated that the Petitioner's mother "had her good days and her bad days. I believe that Lovetta was manic-depressant." Ms. Stewart had worked at a mental hospital for twenty-five years, during which time she had the opportunity to observe many types of mental illness. Ms. Stewart also noted that Lovetta Morris would walk around wearing underwear on her head and that she would put a chain and padlock on the refrigerator. Ms. Stewart also recognized that her son, Michael, became "more and more like [the Petitioner]." She stated that "he became very agitated and talks very fast," and "[h]e also likes to stay up late like [the Petitioner]. He is often very paranoid." Another son of the Petitioner, Floy, indicated similar symptoms, such as getting easily agitated.

While Dr. Woods found these affidavits consistent with the statements provided by Mr. Granger and Karen Morris, it was significant that Dr. Bernet did not have this information. He specifically remarked about possible indications in Dr. Bernet's report of his concern of manic-depression that could not be explored due to the lack of information. In this regard, he also pointed to Ms. Shettles' concerns that the Petitioner was manic-depressive. Dr. Bernet's evaluation, per his testimony, was limited to his interview with the Petitioner, the affidavit of complaint, the Jackson Police Department's incident report, Angela Ragland's statement to the police, the Petitioner's statement to the police, and some psychiatric evaluations. Dr. Woods opined that these documents would not have provided any insight as to bipolar illness for the Petitioner.

Pointing specifically to information that, one on cocaine could only have one ejaculation and comparing this to Ms. Ragland's report that the Petitioner had multiple erections within a very short period of time, Dr. Woods stated that it was these "dichotomies that were not answered because in my opinion the attorneys did not fully explore the options." Dr. Woods further stated that "in Dr. Bernet's notes there was a question in his mind" as to the possibility of bipolar disorder.

In terms of a psychological illness, Dr. Woods concluded that the Petitioner

really suffers from at least three. First of all, it's my opinion that he suffers from a Bipolar Disorder that is most consistently hypomanic, although it's my opinion that at the time of the offense that he was in a manic state. That he also suffers from a Substance Abuse Disorder that is in institutional remission at this time but at the time of the offense was certainly in an intoxicated state. And the third one . . . is that [the Petitioner] suffers from significant cognitive impairments.

These diagnoses are made with consideration of the fact that the Petitioner has had at least four head injuries. Two had the potential to impair his functioning. Dr. Woods joined Dr. Smith's determination that the Petitioner's use of cocaine on the night of the murders amplified his psychotic state.

On cross-examination, Dr. Woods stated that the Petitioner was able to premeditate "as it relates to getting a gun and taking it over there." He conceded that the Petitioner understood that there were consequences for committing rape. Dr. Woods opined that the Petitioner's bipolar disorder did "impair his appreciation of the wrongfulness of his conduct." Notwithstanding, Dr.

-25-

Woods did concede that he had not read the entire trial transcript. Despite his diagnosis of bipolar disorder, Dr. Woods conceded that the Petitioner has never been and is not currently being treated for the illness.

Dr. James Walker, a neuropsychologist, was contacted by the State to conduct an evaluation of the Petitioner. In evaluating the Petitioner, Dr. Walker consulted numerous records provided by the District Attorney's Office, including the evaluations of Dr. Bernet, Dr. Parker, Dr. Auble, and Dr. Woods. He was also provided statements made by the Petitioner at the time of his arrest and the statements of Angela Ragland made to law enforcement officers. Prior to his testimony in court, Dr. Walker also reviewed numerous affidavits.

Dr. Walker visited the Petitioner at Riverbend on at least four separate occasions. During his meetings with the Petitioner, Dr. Walker performed "a standard clinical interview," making observations of his behavior, asking him numerous questions about his history, and making inquiry as to his present condition. An assistant accompanied Dr. Walker and administered several psychological tests, including the Minnesota Multiphasic Personality Inventory, the Personality Assessment Inventory, the Structured Interview of Reported Symptoms, the Miller Forensic Assessment of Symptoms Test, and the Vanderbilt Sentence Completion Test. Dr. Walker did not complete any neurocognitive testing, but these tests had already been performed by Dr. Auble. As he failed to determine any inconsistencies or problems with her data, Dr. Walker elected to rely upon Dr. Auble's results.

The Petitioner provided Dr. Walker with his account of the events of the day of the double homicide. Dr. Walker related that the Petitioner's "speech was very forceful." He added that the Petitioner was "pretty talkative. . . . His speech was articulate and it was fluent." Dr. Walker "did not detect any obsessions or delusions." He added that

> [the Petitioner] said that he perceived that he had been the victim of social injustice during most of his life, that society was pretty much ordered to keep people who are African-American or of lower socio-economic status or didn't have the benefits of some other people in society from performing as well or earning the benefits that others did. He specifically related that to the legal system and talked about how that capital punishment was extremely unfair. The entire legal system was set up to prevent him from getting fair treatment – and not only himself, but others who found themselves in a similar plight.

Dr. Walker observed that the Petitioner's thinking was logical, and he confirmed Dr. Auble's finding of intelligence in the low-average range. Dr. Walker reported that the Petitioner's "mood was pretty hostile and irritable with me. He was cooperative with me. He generally did what I asked him to do, but it was clear that he had some persistent hostility and irritability." Dr. Walker made several inquiries regarding hallucinations. The Petitioner denied having "seen anything or heard anything" at the time of the offenses that really was not there. Dr. Walker also failed to find any evidence of "attending to internal stimuli." He explained that "many times when people are actively hallucinating you can actually tell that they're hallucinating while you're meeting with them." Dr.

Walker reported that the Petitioner responded appropriately to questions. Despite the Petitioner's quick responses to most questions, Dr. Walker observed that the Petitioner "was rather slow to answer some of those questions" about the events of the night in question.

The Petitioner understood the nature of Dr. Walker's visit and reported to Dr. Walker that, on the night in question, he had smoked about $500.00 worth of cocaine. He added that he had consumed "about twenty-four beers." The Petitioner also reported that, "in the weeks preceding the killing[,] . . . that a female neighbor a few houses away had falsely accused him of rape." He explained that he and this woman had actually been engaged in an affair and that she had charged him with rape after they had an argument. Because the Petitioner was on probation at the time, he felt that he would certainly go back to prison. The Petitioner informed Dr. Walker that these events made him upset and that he began to use cocaine for the first time in his life in an attempt to commit suicide. Regarding the dual homicides, the Petitioner related that

> he was sitting on his porch when his neighbor came home. . . . [H]e said that he'd had some past dealings with his neighbor that made him somewhat upset. But that evening he said Mr. Ragland had threatened his wife and threatened him with physical and bodily harm. He commented that Mr. Ragland was not aware of who he was . . . and that he was not a person to be messed with. He became very angry at this disrespect and he said that he . . . determined to take Mr. Ragland's life. . . .

> . . . .

> He said that he entered the house and induced Mr. Ragland to begin apologizing, at which point he shot him. He also said that he had planned to leave at that point, but then he heard footsteps coming up behind him. He turned and hit Ms. Hurd with a gun at that point, knocking her down. I mentioned that I thought that she was stabbed, not necessarily injured with a gun, and he said that she must have fallen on the knife. I asked him how it was that she had been stabbed thirty-seven times. And this is one of those points at which he paused a very long time before answering . . . and he said that this was probably a fabrication on the part of the police. . . . I asked him again if he had any hallucinations or delusions that day. He said no. I asked him what effect the cocaine had on him, and he said, "The cocaine made me paranoid." . . . [H]e said that paranoid meant that it made him very, very nervous about everything.

Dr. Walker related that the Petitioner had been evaluated by the prison mental health system. The prison clinician noted "[the Petitioner] to have constricted affect." Dr. Walker explained that "constricted affect" means that "[the Petitioner] had difficulty expressing his emotions as other people do." The prison clinician further noted that the Petitioner was "defensive, rigid, and constantly complaining." "The assessor found him to have potential paranoia and anti-social tendencies." The report also stated that the Petitioner did not appear to be psychotic. A few months after this evaluation, the Petitioner reported to the Mental Health Service at Riverbend that he was

feeling suicidal. The Petitioner told prison clinicians that he felt "confined, that the walls were sort of closing in on him, and he asked to see a Baptist Chaplain in order to be saved."

The Petitioner informed Dr. Walker that he had been "shot in the past." Other than this incident, the Petitioner denied any other serious illness. The Petitioner did mention that "he had been knocked in the head a few times," but that "he had never lost consciousness." He added that he was not taking any medications and that he had never received any kind of psychiatric treatment. The Petitioner generally denied any reports of anxiety, depression and suicide attempts with the exception of the few weeks prior to this incident. The Petitioner added that, during that time, he even took a "few pills in front of his wife . . . as part of a suicide gesture." Regarding his drug use, the Petitioner reported that, although he had sold drugs in the past, he had never used any before the night of the murder. On another occasion, however, the Petitioner reported that he began using PCP at age fourteen, that he had used LSD many times as a teenager, and that he regularly drank beer. Dr. Walker also learned that the Petitioner had a history of abusing methamphetamine or amphetamine of some kind.

The Petitioner denied a history of assaulting people. The Petitioner did indicate getting into fights and stating that he "might have knocked a few people's heads" when he was a teenager. The Petitioner reported numerous arrests in St. Louis for selling drugs, and that his drug past was a reason to move to Tennessee, "to get away from that lifestyle." He acknowledged a "conflict with a man named Michael Harrington." He later acknowledged an arrest for waving a shotgun at a woman. He denied participation in that incident, however, stating that the woman was mentally disturbed and had made a false accusation. The Petitioner reported to Dr. Walker that he had entered the military because he was out of work. His goal was to become a military policeman, but the military failed to give him the training that he wanted. The Petitioner was eventually discharged with a general discharge.

Dr. Walker related that he understood that the Petitioner had lived with his wife, children, and stepchildren. The Petitioner and his wife, Karen, had been together for sixteen years, although they had only been married for five. The couple had one child together, and Karen had two children. The Petitioner admitted to having multiple affairs. The Petitioner stated that the woman who charged him with rape was a woman with whom he had been involved in a relationship for some time. The Petitioner described himself as a model prisoner.

Dr. Walker explained that George Barlis is the psychological examiner at Riverbend. George Barlis and Sharon Wolfenbarger are the individuals who initially screen inmates for any kind of mental health problems while they are at Riverbend. Mr. Barlis reported that he was unaware of an initial evaluation of the Petitioner. Sharon Wolfenbarger reported that, if the Petitioner ever did exhibit signs of mental disturbance, he would be referred for an evaluation and would potentially be examined by a psychiatrist.

Dr. Walker related that the Miller Forensic Assessment of Symptoms Test and the Structured Interview of Reported Symptoms were tests designed to identify people who are faking the presence of a psychiatric problem that is not really there or are grossly exaggerating their psychiatric

problems. The tests revealed that there was no indication that the Petitioner was faking or exaggerating a mental condition. Notwithstanding, Dr. Walker observed that the Petitioner was "somewhat defensive on the other tests," particularly the Personality Assessment Inventory. The Petitioner's answers to test questions indicated that he was very mistrustful and was very suspicious of the motives of other people. Dr. Walker described the Petitioner as "hostile, argumentative, and irritable. He is quick to read ill motives into other people."

While the test results reflected an "egocentric" individual, i.e., the Petitioner measured most things in terms of what kind of benefit they might have on him, there were also indications that his self-esteem was not so good. On the Minnesota Multiphase Personality Inventory, the Petitioner's responses were consistent with Dr. Walker's observations, that is, the Petitioner is "very concerned about social issues," "concerned about authority," "[has] conflicts with authority," and "[is] a very cynical person who is rather skeptical of the motives of other people."

As a result of his evaluation, Dr. Walker concluded that the Petitioner

> was certainly intoxicated with cocaine and alcohol on the night of the events in question. He had smoked a large amount of cocaine, whether it's the 250 as been reported previously or $500.00 worth. He had smoked a lot. He had also had at least twenty-four shots or beers – shots of alcohol or beer, maybe more when we put it together that he also used liquor. So, I felt that intoxication was a very powerful factor affecting his behavior that evening. It would have had to have been.
>
> . . . .
>
> Secondly, we know from Dr. Auble's testing that [the Petitioner] has a history of problems with his thinking and reasoning. He is not a person who is able to put things together very well in his mind. Even when he's not intoxicated, it's difficult for him to reason and think effectively.
>
> And that probably played a role as well. I found that there were indications that he was very distressed at the time of the offense. . . . I'm not sure . . . that he was actually trying to commit suicide that night. The fact that he would show up with a friend that evening trying to buy cocaine . . . it was not clear to me that he was actually trying to take his life. But I did believe that he was certainly very upset by the events that had happened over the weeks before.
>
> . . . .
>
> I also came to believe that he had some significant personality disturbances. This is a man who has persistent paranoia. He has difficulties with controlling his behavior. He has difficulties with hostility. Difficulty with behavior that society would condemn. And that's been a persistent problem on and off throughout much of his life.

Dr. Walker then proceeded to explain the term bipolar disorder, noting that "[a] lot of the controversy . . . in this case, is a disagreement about what we should call people who are in this middle category." He explained:

> Initially, in Dr. Woods' report, he diagnosed [the Petitioner] as having Bipolar Disorder and he listed the criteria there that described this Bipolar Disorder at the top – the one with psychosis or mania – the mania that usually results in psychosis. Dr. Woods has testified . . . that perhaps the kind of Bipolar Disorder that [the Petitioner] has is more the kind that is somewhat below that – the kind that results in generalized hypomania over time. I have diagnosed [the Petitioner] with probably personality characteristics of a paranoid nature and of an antisocial nature. And after reviewing the family information, I would agree that he does have a history of hypomania. And, so, I would also classify him as being in this category here – a person who has a difficulty in stabilizing their mood. But I . . . believe that he does not fall in this upper category – this severe Bipolar Disorder that takes a person completely out of reality.
>
> . . . I think what Dr. Woods is also saying is that he doesn't fall in this category except perhaps on that one night when he took all that cocaine and drank all that alcohol. So, my finding is I believe he does have a disorder that seriously affects his functioning. It does result in impairment, but it would not be called Bipolar I Disorder.

Dr. Walker proceeded to explain the meaning of "cocaine induced psychosis." He stated that certain persons react to amphetamines and cocaine "much worse than the average person." These people, rather than simply becoming intoxicated, "began to look very much like what we would call schizophrenic, a person who would be completely out of touch with reality." This disorder, in some instances, "would persist over several days or even weeks." Dr. Walker determined that the Petitioner did not have a cocaine induced psychotic disorder. The Petitioner's relation of the events of that night were "fairly consistent with severe cocaine intoxication plus alcohol intoxication. . . . His behavior was irrational. He had perceptual disturbances consistent with intoxication. But he did not have the lasting kind of psychosis and the lack of insight that we would see in a Substance Induced Psychotic Disorder." Dr. Walker further related that the heavy use of alcohol and/or cocaine made it difficult to identify Bipolar Disorder because a person that is high on cocaine "looks very much like a person who is very, very manic." He added that it was clear that the Petitioner "was chemically dependent from . . . the time he was a teenager, and he regularly used . . . mood altering drugs during the entire course of his life." It is equally as clear, however, that the Petitioner has had "mood problems that were not accounted for by drugs and alcohol during that time as well." Dr. Walker stated that the Petitioner was not bipolar in the "Bipolar I sense."

Regarding the cause of this crime, Dr. Walker declined to offer an answer. He stated that the Petitioner had a history of being very unhappy and angry. He had a history of a personality or mood condition and a history of chemical dependence. Dr. Walker surmised that the only way to answer this question was to look at whether the Petitioner had ever done anything like this in the past, which

-30-

he had not. Thus, Dr. Walker stated that he doubted that the Petitioner would have committed these crimes but for the use of cocaine.

On cross-examination, Dr. Walker stated that he did not see any indication of frontal lobe dysfunction. He did observe, however, some degree of brain dysfunction.

## Findings of Post-Conviction Court

By order entered January 18, 2005, the post-conviction court denied the Petitioner relief. The court concluded that the Petitioner had failed to establish by clear and convincing evidence the violation of any constitutional right, that he failed to establish that he was denied the effective assistance of counsel, and that the Petitioner failed to establish the grounds alleged. The court entered a comprehensive twenty-two page findings of fact and conclusions of law, which are summarized as follows:

1. Counsel did establish and carry on a proper working relationship with petitioner. Counsel had many interviews with petitioner and encouraged him to provide investigative assistance and any and all information that could possibly be helpful in his case. . . . Counsel had every reason to believe that petitioner was competent and being cooperative.

2. Counsel adequately prepared for the representation of petitioner. Their efforts to discover and make use of all relevant witnesses were well within the bounds of competency. . . . [I]t was reasonable for counsel to feel confident that Inquisitor [Inc.] would do its job well as was in fact the case.

Counsel retained Dr. William Bernet . . . for a psychiatric opinion . . . .

Counsel retained Dr. Robert Parker, a doctor of pharmacology[,] . . . to testify about the effects of crack cocaine.

Counsel had the report of Dr. Richard Drewery, a clinical psychologist and Dr. Rick Pullen, staff psychiatrist . . . who had examined and evaluated the petitioner upon court order and found him to be competent to stand trial; and . . . found that there was not a basis for an insanity defense.

Counsel adequately prepared for cross-examination of the State's witnesses but the State's critical witnesses were virtually unimpeachable; and petitioner has failed to show otherwise.

3. Counsel . . . were thoroughly familiar with the law applicable to Petitioner's case.

4. The Public Defender's Office did have a heavy workload but they devoted the time needed to adequately represent Petitioner. . . .

5. Counsel made all appropriate objections. . . .

6. Counsel thoroughly investigated the case and prepared for effective representation of petitioner. The record is not clear as to whether counsel specifically investigated the "true nature of the relationship between Mr. Morris and his neighbors the Raglands." However, there has been no showing by petitioner that such an investigation would have been helpful to the defense. . . .

7. Counsel thoroughly investigated the case in preparation for the sentencing phase and presented mitigation evidence that was available. There has been no showing that counsel was deficient in this regard.

8. Counsel subpoenaed and presented all witnesses available and believed to be helpful to the defense . . . .

9. Counsel filed and pursued all meritorious motions . . . .

10. (a)  It is not clear whether counsel requested the assistance of an independent pathologist but there was no reason to believe that an independent pathologist would have had an opinion substantially different from that of Dr. O.C. Smith. . . .

(b)  . . . there did not appear to be a need for a neuropyschologist or neuropsychiatrist. Petitioner was evaluated by a psychologist and a psychiatrist.

(c) . . . Inquisitor was retained for a social history of petitioner and counsel also investigated. . . .

11. Counsel was aware of the aggravating circumstances . . . [a] bill of particulars was unnecessary and would not have helped.

12. Counsel had full discovery . . . .

. . . .

14. Counsel did . . . file pre-trial motions seeking the resources necessary for competent representation. . . . Petitioner has failed to show by specific facts how any further assistance would have helped.

15. There has been no showing . . . as to whether or how the jury selection process . . . was unconstitutional. . . . [P]etitioner did . . . have a fair and impartial jury. . . .

. . . .

17. Mr. Al Earls . . . did not have a conflict of interest. . . . This issue has

been decided by this court and affirmed on appeal.

. . . .

22. Counsel properly pursued a Motion for Change of Venue and there was nothing counsel could do to prevent the Court from properly denying the motion. . . .

23, 24, 25. It is clear that, if the defendant was restrained at all during the guilt/innocence phase, the restraints were limited, under his pants legs and not visible to jurors. This limited restraint did not impair defendant's ability to cooperate in his defense and did not prejudice defendant. There is no proof, direct or circumstantial, that the jurors knew of the restraints. Petitioner does not seriously or with evidence charge improper shackling at the guilt/innocence phase but he does insist that he was improperly shackled in violation of his constitutional rights during the sentencing phase; and relies upon the testimony of Mr. Googe, Mr. Taylor and Ms Shettles . . .

Mr. Googe testified . . . "after the guilty verdict . . . that he was restrained at least with leg irons, and he may have had handcuffs on then. I can'[t] recall absolutely one way or the []other. But I do recall him having the leg irons on and possibly handcuffs after the conclusion of the guilt-innocence phase of the trial."

Concerning hand restraints, Mr. Googe said – "I believe he may have had a hand free . . . . I think he was mainly doing some drawing rather than taking notes at that time."

Mr. Taylor testified . . . "I believe during the sentencing phase because The Court indicated because there was a conviction . . . they put leg restraints on him that were visible."

Concerning hand restraints Mr. Taylor said --- "I can't remember, but . . . they may have. . . . I do remember the court making a distinction that because there was a conviction that . . . they could be seen."

Ms. Shettles testified . . . [the Petitioner was unable to draw and write during the sentencing, and added] ". . . I was asked to move back which would have been to a bench behind the table and that the pencil and pad was taken away at that time."

There is no reason to question the credibility of these witnesses . . . even though their testimony is inconsistent and replete with words and phrases of uncertainty. This court attributes that uncertainty to the fact that the trial took place in January 1997 and the post-conviction hearing took place in April 2004; In such a situation, the post-conviction testimony must yield to the trial record. There is nothing in the trial record to support the charge that the defendant was visibly (to jurors) shackled and that his pencil and pad were taken from him during

-33-

guilt/innocence or sentencing phase. It is undisputed that during the guilt/innocence phase defendant was not shackled in view of the jury and there is nothing in the record to show any change between the two phases relative to restraints. Moreover, it is highly improbable if not inconceivable that the court and counsel (three defense lawyers plus the D.A. and staff) would have let such a thing (shackling) happen without making a record of it; and there is no record. As Mr. Googe said at the post-conviction hearing, "We didn't want him in shackles if we could avoid that." The trial record outweighs the post-conviction testimony.

Accordingly, this court finds as a matter of fact that, at the guilt/innocence and the sentencing phase, the defendant was not visibly (to jurors) shackled or restrained, that his writing needs were not taken from him and that he was not prejudiced in this regard.

. . . .

27. The State limited its proof at the sentencing hearing to specific aggravating circumstances and so a motion by counsel was not necessary.

. . . .

31. Counsels' preparation and presentation of experts was done in a proper and effective manner. Dr. Bernet and Dr. Parker had all the information they needed to testify as they did. There [sic] testimony was as effective as it could be given the facts in this case.

32. Counsel were adequate in the voir dire of prospective jurors and the petitioner's allegations in this regard are in all respect unfounded. There were no errors in the jury selection process and a fair and impartial jury heard the case. . . .

33. Counsel adequately and effectively investigated and presented evidence of petitioner's diminished capacity and state of mind at the time of and in connection with the crimes. . . .

34. Petitioner's charge that counsel were ineffective for not presenting mitigation testimony/evidence on petitioner's "life history" is not supported by the record or proof presented at the post-conviction. There has been no showing that there was any evidence in this regard that would [have] helped petitioner or changed the outcome of the case.

35. Counsel was not deficient regarding jury instructions. The instructions given were accurate and complete and in strict compliance with Tennessee Pattern Jury Instructions as well as statutory, case and constitutional law. Petitioner's charges in this regard are unsupported by the record or proof presented at the post-conviction hearing. Further, petitioner was not prejudiced by the instructions given

or not given and if the requests/objections suggested by petitioner had been granted/sustained the petitioner would not have benefitted and the outcome of the case would have been the same.

. . . .

## Additional/General Findings of Fact

1. After thorough and proper investigation and preparation, counsel had no medical/scientific reason to believe that petitioner was suffering from a mental or physical disease, defect or condition (other than cocaine effects) that would have supported an insanity defense, prevented him from entertaining the requisite culpable intent or mitigated the crimes at the guilt/innocence or sentencing phase.

2. Petitioner had no history of, and had never been treated for, mental illness or defect. Moreover, he had lived a reasonably normal life and had functioned satisfactorily insofar as employment was concerned. At the time of the crimes, he was regularly employed and doing a good job. There is no indication that he was treated for mental illness/defect during the course of military service.

3. During pre-trial confinement with Tennessee Department of Correction . . . petitioner was not diagnosed with, or treated for, mental illness/defect even though he was screened and facilities were readily available. Quite to the contrary, several witnesses . . . were of the opinion that he was a good prisoner and functioned very well. . . .

4. However lay observations made upon interviews with petitioner and others indicated that he had some problems probably of a mental or personality nature. Petitioner appeared abnormally agitated, animated, loud and demonstrative. He showed signs of "bipolar," and according to Ms. Shettles seemed to have a "screw loose." He had difficulty keeping his thoughts on track . . . . He seemed to have an aversion about discussing the alleged crimes. Also counsel learned that petitioner in the past had suffered a number of injuries, some to the head. In short, his behavior from a lay standpoint seemed abnormal.

5. In response to the things mentioned above, counsel prudently petitioned the trial court for funds to retain a psychiatrist. . . . Dr. Burnet [sic] interviewed petitioner at length . . . . Dr. Burnet [sic] testified . . . at the trial in favor of petitioner's cause, some of his testimony/conclusions being as follows:

(a) petitioner had suicidal thoughts;

(b) the cocaine consumed by petitioner affected him physically and psychologically;

(c) the cocaine . . . caused a fast heart and brain beat, agitation, paranoia, confusion and delusions;

(d) petitioner thought Charles Ragland was going to kill him and his family;

(e) the cocaine . . . may have prevented him from entertaining the culpable intent . . . to commit any of the crimes charged;

(f) petitioner was under extreme mental and emotional stress . . .

(g) petitioner's behavior during the course of the crimes was bizarre and made no sense;

(h) signs of abnormality were clear upon interview of petitioner.

6. Counsel had every reason to believe that if an evaluation by a neuropsychologist or neuropsychiatrist was in order that Dr. Bernet would have recommended it. He did not. As a matter of fact, it is improbable that state funds would have been authorized because counsel had no support for a motion.

7. . . . Dr. Robert Parker, a pharmacologist[,] . . . was retained to testify about the effects of crack cocaine use. . . .

8. . . . [C]ounsel jointly made an informed decision . . . to pursue the theory that petitioner was unable to form the intent . . . to commit the crimes charged because of pre-existing mental health problems exacerbated by the use of a large amount of cocaine. . . . [T]hey would rely upon lay proof of apparent abnormal behavior and the expert proof provided by Dr. Bernet and Dr. Parker. . . . This strategy was reasonable if not the best.

9. . . . [P]etitioner presented three expert witnesses, Dr. George W. Woods, Jr., Dr. Pamela Auble and Dr. Murray W. Smith. Petitioner avers that if the case had been properly investigated the need for similar expert testimony would have been apparent. . . .

10. Dr. Woods is of the opinion – that petitioner. . . suffered from a number and variety of mental diseases and defects . . . including bipolar disorder, hypomania, manic psychosis, substance abuse disorder, cognitive impairment and that he was psychotic and delusional; that the consumption of the large amount of cocaine amplified his psychotic condition; that as the result of these things he may have been unable to distinguish right from wrong and unable to conform his conduct . . . . Dr. Woods cannot say whether or not petitioner would have committed the crimes in the absence of the cocaine consumption. . . . .

11. Dr. Smith . . . is of the opinion that petitioner suffers . . . from several

abnormalities including bipolar disorder and brain damage related to memory capacity deficits. Dr. Smith . . . concludes that petitioner suffered from cocaine induced psychosis at the time of the crimes and was delusional. Dr. Smith opines . . . petitioner did not realize he was doing anything wrong. . . .

12. Dr. Auble found that petitioner could very well have been suffering from brain damage resulting from an extensive history of drug/alcohol abuse and head injuries. She is of the opinion that a complete neuropsychological and psychological examination should have been done to explore that possibility . . . . She also thinks that this type of evaluation along with a social history would have assisted in developing mitigation themes . . . .

13. The opinions of these three experts . . . are so contradicted by the virtually undisputed facts in this case that it is improbable that they would have been accepted . . . . Some of those facts which clearly show motive, intent, deliberation, premeditation and mental competence follow:

(a) Petitioner was disturbed because Charles Ragland had "disrespected" him . . . and petitioner told Ragland that he would regret it . . . ;

(b) . . . [P]etitioner planned to enter Ragland's home and laid [sic] in wait for the opportunity; and in the meantime, he got his shotgun and loaded it with two shells;

(c) Upon seeing Erica Hurd at the car, he used the shotgun to take charge of her and use her to make entry into the Ragland home;

(d) After entry . . . by display and threat of the shotgun demanded "dope";

(e) . . . [P]etitioner placed a pillow over Ragland's head . . . and shot him in the head. . .;

(f) Petitioner covered the windows with a mattress so that "nobody could see. . .";

(g) Petitioner order[ed] Erica into a closet with a threat to "blow her head off";

(h) Petitioner . . . took Erica into another room and killed her by multiple stabbings in a targeted fashion. . . ;

(i) Petitioner told Angela Ragland that he had been "accused of raping someone and if he was going to jail he was going to jail for doing something" . . .;

(j) Petitioner told Angela Ragland to tell police that she found the bodies . . . when she arrived at home . . .;

-37-

(k)  Petitioner used a cloth in an attempt to remove his fingerprints . . .;

(l)  Petitioner hid the murder weapon . . . in his apartment;

(m) Petitioner warned Angela Ragland not to go [to] the police.

14.  The evidence that would have been provided by Dr. Woods, Dr. Auble and Dr. Smith was not significantly different from that provided by Dr. Bernet and Dr. Parker. . . .

15.  Further, the expert witnesses . . . if called at trial would have been vulnerable to damaging cross-examination because it would have afforded the state an opportunity to rehash and emphasize the most damaging . . . and horrific details of the alleged crimes.  In short, the probability is that the testimony of these witnesses would have been more harmful tha[n] helpful.  Counsel were not derelict in failing to present similar evidence.

16.  Dr. James Walker . . . concluded . . . that petitioner did not suffer from any serious mental disease or defect but that he did suffer from a brain or personality disorder that seriously affected his ability to function, think and reason and caused paranoia.  He contradicts Dr. Woods . . . in that he does not think that petitioner suffers from a bipolar disorder. . . .

. . . .

## CONCLUSIONS OF LAW

1.  Petitioner was not denied effective assistance of counsel at trial or on appeal.

a.  the advise [sic] given and services rendered by counsel were well within the range of competence demanded of attorneys in criminal and death penalty cases;

b.  counsels' conduct in representing petitioner did not undermine the adversary process and the trial and appellate process can be relied upon to produce a just result;

c.  The strategic and tactical decisions/choices made by counsel were reasonable and informed and based upon thorough investigation and preparation;

d.  If counsel had made the strategic and tactical choices/decisions suggested by petitioner. . ., the outcome of the case . . . would have been the same.

. . . .

3.  The jury instructions given at the trial were accurate, complete and in strict

-38-

compliance with Tennessee Pattern Jury Instructions . . . .

. . . .

7. The petitioner has failed to establish the grounds for entitlement to post-conviction relief by clear and convincing evidence.

## I.  Standard of Review

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. This petition is governed by the 1995 Post-Conviction Procedure Act, which requires that allegations be proven by clear and convincing evidence. See id. § 40-30-110(f). Evidence is clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from the evidence. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

Once the post-conviction court has ruled upon a petition, its findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. Wallace v. State, 121 S.W.3d 652, 656 (Tenn. 2003); Nichols v. State, 90 S.W.3d 576, 586 (Tenn. 2002) (citing State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)). This Court may not reweigh or reevaluate the evidence or substitute its inferences for those drawn by the post-conviction court. Nichols, 90 S.W.3d at 586. Questions concerning the credibility of witnesses and the weight to be given their testimony are for resolution by the post-conviction court. Id. (citing Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997)). It is, therefore, the burden of the petitioner to show that the evidence preponderates against those findings. Clenny v. State, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978).

Notwithstanding, determinations of whether counsel provided a defendant constitutionally deficient assistance present mixed questions of law and fact. Wallace, 121 S.W.3d at 656; Nichols, 90 S.W.3d at 586. As such, the findings of fact are reviewed under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). In clarifying the standard, our supreme court explained that the standard for reviewing the factual findings of a trial court has always been in accordance with the requirements of the Tennessee Rules of Appellate Procedure, specifically Rule 13(d). Id. at 456.

The Petitioner contends that a contradiction exists in the current status of the law. Specifically, he complains that the standard utilized in Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997), which states the post-conviction court's findings are given the "weight of a jury verdict," cannot be reconciled with the Rule 13(d) standard–"de novo upon the record of the trial court, accompanied by a presumption of correctness." The Petitioner asserts that this Court must apply the more relaxed de novo standard of review espoused in Fields. The Henley standard invoked the Rules of Appellate Procedure regarding standards to be applied upon review. See Kennath Henderson v. State, No. W2003-01545-CCA-R3-PD, 2005 WL 1541855, at *29 (Tenn. Crim. App., Jackson, June 28, 2005), perm. to appeal denied, (Tenn. Dec. 5, 2005) (citing Henley, 960 S.W.2d at 578-579).

Both the Fields standard and the Henley standard presume the trial court's findings are correct unless the evidence preponderates otherwise. Henderson, 2005 WL 1541855, at *29 (citing Fields, 40 S.W.3d at 458; Henley, 960 S.W.2d at 578). Finally, we remain as perplexed by the Petitioner's complaint as was a prior panel of this Court when presented with the identical challenge in Henderson v. State, as the standard the Petitioner requests be imposed is the standard employed by the appellate courts of this state. Id.

## II. Analysis of Petitioner's Claims Before this Court

### A. Errors Alleged at Post-Conviction Evidentiary Hearing

#### 1.Trial Court Applied Erroneous Standard as to Claim of Ineffective Counsel

The Petitioner alleges that the "burden of proof applied by the post-conviction court on the issue of ineffective assistance of counsel violates federal constitutional law." Petitioner supports this allegation with the following arguments: (1) the court failed to cite to any legal authority concerning the issue of ineffective assistance of counsel and (2) the post-conviction court's order states that "[t]he petitioner has failed to establish the grounds for entitlement to post-conviction relief by clear and convincing evidence," "[t]hat petitioner has failed to establish that he was denied effective assistance of counsel . . .," and "[t]hat generally, the petitioner has failed to establish the grounds alleged and the entitlement to post-conviction relief by clear and convincing evidence." While the Petitioner concedes that this standard applied by the post-conviction court is that mandated by Tennessee law, he contends that this standard of clear and convincing proof places an unconstitutional burden on him that is not required under Strickland v. Washington, 466 U.S. 668, 687 (1984). Specifically, the Petitioner argues that the post-conviction court applied a standard requiring the Petitioner to prove by "clear and convincing" evidence that "but for" counsel's errors, the resulting verdict would have been different, rather than requiring proof by a "reasonable probability" that, but for the errors, the result would have been different. The State responds that no such deviation from the burden of proof required by Stickland occurred.

While the post-conviction court did not cite to Strickland v. Washington in its order, there is no requirement that the post-conviction court cite to a controlling precedent, so long as neither the reasoning nor the result of the decision contradicts it. Although the post-conviction court references a "clear and convincing" standard, it does so with regard to whether the Petitioner has established his factual allegations and not whether he satisfied the Strickland standard. There is no evidence in the record that the post-conviction court erroneously converted the Strickland "reasonable probability" standard to one requiring "clear and convincing" evidence that the outcome would have been different. The post-conviction court's reference to the "clear and convincing" standard is made to the Petitioner's burden of proof establishing the entitlement to post-conviction relief. In other words, although a petitioner must establish "convincingly" his or her entitlement to post-conviction relief under state law, a petitioner who relies upon a claim of ineffective assistance of counsel can make this "convincing" showing by satisfying the Strickland "reasonable probability" standard. In this case, it is apparent that the post-conviction court found that the Petitioner had not satisfied Strickland and, therefore, was not entitled to relief. Notwithstanding, we acknowledge that claims

of ineffective assistance are reviewed de novo by this Court, with a presumption of correctness applied only to the factual findings of the lower court. Accordingly, error, if any, would have no impact upon the ultimate determination of this Court.

### 2. *Disqualification of Assistant District Attorney General and the District Attorney's Office*

On September 13, 2001, a hearing was held regarding the Petitioner's motion to recuse the Assistant District Attorney General and the District Attorney's Office. The motion was based upon the fact that Assistant District Attorney General Alfred Earls in 1991 represented the Petitioner. Mr. Earls was an assistant public defender at the time. On October 7, 1991, the Petitioner was charged with a drug offense. Mr. Earls was appointed to the Petitioner's case on October 15, 1991. During Mr. Earls representation of the Petitioner, numerous motions were filed on the Petitioner's behalf. Specifically, Mr. Earls filed a motion for discovery on October 24, 1991, and a notice of entrapment defense filed on October 30, 1991. The parties stipulated that Mr. Earls had personally talked with the Petitioner during his representation. Prior to the completion of the Petitioner's case, Mr. Earls employment with the Public Defender's Office terminated on October 31, 1991. Mr. Earls began his career with the District Attorney's Office the following day. Another attorney with the Public Defender's Office replaced Mr. Earls as the Petitioner's counsel. The Petitioner ultimately entered a guilty plea to the drug offense for which he received an eight-year sentence to be served in Community Corrections.

In support of the motion to recuse, the Petitioner's counsel relied upon Clinard v. Blackwood, 46 S.W.3d 177 (Tenn. 2001), for the proposition that "prior representation, particularly when the subject matter has to do with something that was brought up in the second trial – and this case – the first trial was about Possession and – or Sale and Delivery of Cocaine . . . [a]nd the knowledge gained by Mr. Earls from prior representation and actual consultation with the defendant – we believe case law is – and the ethical rules are crystal clear that he can no longer represent the State in this matter, and the matter of the entire office involves Mr. Woodall." Counsel continued to argue that, even if an actual conflict did not exist, the appearance of impropriety mandates recusal and, due to the lack of screening procedures, also mandates the recusal of the entire District Attorney's Office. In response to this argument, Mr. Earls asserted that there was nothing the State would have learned from his representation of the Petitioner that the State did not already know. Additionally, Mr. Earls argued that "there was no issue raised about any conflict with the D.A. and [the Petitioner] at that time. It wasn't apparent then. There was no issue raised during the trial of this matter. There wasn't any apparent conflict then. There was no issue raised on appeal." He added that "it's a well-established law – that once a lawyer represents a client in one case . . . [t]hat doesn't mean he can't represent him or oppose him somewhere down the line years later."

> Mr. Earls then proceeded to testify to the following:
> I gained no information from my representation of [the Petitioner] in '91 that was in any way used or could have been used in the murder trial, and I did not convey that information. . . . I didn't have any to convey and – to Mr. Woodall or any other member of his staff in the prosecution for the murder case.

The Petitioner's counsel then questioned Mr. Earls regarding the fact that the Petitioner's prior conviction involved cocaine and the fact that the Petitioner's use of cocaine was later used as a mitigating factor in the subsequent murder prosecution. Mr. Earls responded:

> [The Petitioner] used an intoxication defense based upon consumption of cocaine. Now, the exact parameters of that, I haven't reviewed the case file enough. But he did use it. He used it in the Motion to Suppress, and he also used it – or tried to use it in the Motion to Suppress. He used it at trial and used it in sentencing. So – if that answers your question?

In light of the information before the court and the argument made by counsel for both the Petitioner and the State, the post-conviction court found as follows:

> The Motion to Recuse the D.A.'s Office is – and Mr. Earls is denied. You know, it is a troublesome thing. I want to let you know. I don't – these things aren't taken lightly. It presents a problem any time that you have a situation like this. But reading from the <u>Claybrook</u> case some of the excerpts – and what it says really is that it must be a situation where some confidence was gained by the lawyer which could have been used or was used or at least could have been used in the subsequent murder trial.

> I don't see any prejudice. In some parts of the case, it talks about showing of prejudice. Of course, that's – I don't think that always has to be present quite frankly, as defense counsel has pointed out. But it has to be that – and I'm reading from this case. "Thus an attorney will not be permitted to prosecute a criminal case if through previous representation of the defendant he has obtained information upon which the prosecution is predicated." The Court finds that there was no information gained which – upon which the murder prosecution was predicated.

> The jury – the reversals that I have seen – and also, it talks about an unacceptable risk of harm or disclosure. It talks about using the confidence and secrets gained by the lawyer. I find no evidence of any confidences or secrets that were used. There was no risk or harm of disclosure of anything by Mr. Earls.

> And of course, you've got to consider this, and you can consider the case itself. This case is a case where I don't see any connection between the two cases at all. I know counsel has argued and believes that the fact that it is a drug case and that there was maybe some cross-examination of some of the witnesses – a couple of witnesses—maybe the brother and maybe one of the expert witnesses about use of cocaine. But that – I don't recall anything other than – being used other than the fact of the conviction which, you know, was there. It was – and of course, the conviction involved a judicial admission by the defendant.

-42-

So, in short, the Court finds that there's – there was no information or any secrets gained in prior representation of [the Petitioner] that even could have been – there was just nothing there that could have been used in the subsequent murder trials, and they weren't used. And I don't think there is any appearance of impropriety although it was a Motion, I understood, that was worthy of being made, should have been made, and has been made.

And for the record, the Motion to Dismiss the District Attorney's Office or recuse them or Mr. Earls is denied. And of course, that's that.

A trial court's ruling on the disqualification of an attorney and of an entire office is reviewed under an abuse of discretion standard. Clinard v. Blackwood, 46 S.W.3d 177, 182 (Tenn. 2001); State v. Culbreath, 30 S.W.3d 309, 313 (Tenn. 2000). A trial court abuses its discretion when it "appl[ies] an incorrect legal standard, or reach[es] a decision which is against logic or reasoning that causes an injustice to the party complaining." State v. Shirley, 6. S .W.3d 243, 247 (Tenn. 1999). For purposes of deciding whether a prosecutor or his office should be disqualified from participation in a criminal case, this Court and our supreme court have adopted the following analytical framework: (1) Do the circumstances of the defendant's case establish an actual conflict of interest that requires the disqualification of a prosecutor? (2) Do the circumstances of the defendant's case create an appearance of impropriety that requires the disqualification of a prosecutor? (3) If either theory requires the disqualification of a prosecutor, is the entire District Attorney General's office likewise disqualified? State v. Coulter, 67 S.W.3d 3, 29 (Tenn. Crim. App. 2001); see also Culbreath, 30 S.W.3d at 312-313; State v. Tate, 925 S.W.2d 548, 550 (Tenn. 1995). A prosecutor's disqualification need not be imputed to the "entire district attorney general's office . . . so long as the attorney at issue does not disclose confidences or otherwise participate in the prosecution." Tate, 925 S.W.2d at 556. While the appearance of impropriety may require vicarious disqualification regardless of adequate screening, Clinard, 46 S.W.3d at 186-87, the disqualification doctrine does not apply identically when an attorney transfers to the district attorney general's office as it does when an attorney transfers to a private law firm. See Tate, 925 S.W.2d at 556; Coulter, 67 S.W.3d at 32-33. Where a criminal defense attorney switches adversarial sides, "the appearance of impropriety is not the central concern. Primarily, it is a matter of an unacceptable risk of harm or disclosure which is at issue." Coulter, 67 S.W.3d at 33 (citation omitted). Additionally, a panel of this Court has observed that private and public practice have significant distinctions, such that screening procedures for attorneys in government service are generally viewed with less skepticism: "The relationships among lawyers within a government agency are different from those among partners and associates of a law firm. The salaried government employee does not have the financial interest in the success of departmental representation that is inherent in private practice." State v. Ricky Raymond Bryan, No. M1999-00854-CCA-R9-CD, 2000 WL 1131890, at *6 (Tenn. Crim. App., Nashville, Aug. 4, 2000) (quoting United States v. Caggiano, 660 F.2d 184, 191 (6th Cir. 1981)); see also Tenn. Sup. Ct. R. 8, EC 7-13 (repealed 2003).

From the record before this Court, it appears that any involvement that Mr. Earls had regarding representation of the Petitioner on the prior drug charge was limited. Indeed, Mr. Earls' representation was for a mere sixteen days and was limited to the filing of several pre-trial motions.

Any information garnered from this limited representation was, as noted by the post-conviction court, public information. Moreover, the Petitioner presented the subject matter of the prior representation, illegal drug possession, as his defense at trial. The post-conviction court found that no information was shared and that any information used in the Petitioner's trial was public record. We cannot conclude that the post-conviction court abused its discretion. The Petitioner is not entitled to relief on this claim.

## B. Errors Alleged at the Petitioner's Trial

### 1. Shackling of the Petitioner during the Penalty Phase of Trial

The Petitioner was shackled when he entered the courthouse with both handcuffs and leg irons. Those shackles were removed prior to the jury entering the courtroom. "Invisible" leg restraints, with weights, were then placed underneath the Petitioner's pants. These restraints were not visible to the jury. After the jury rendered its verdict, the Petitioner alleges that he was shackled in the presence of the jury for the duration of the sentencing phase. He also asserts that the mitigation investigator, Glori Shettles, was instructed to move back away from the Petitioner. He alleges that the paper and pencil used by the Petitioner throughout the trial were confiscated during the sentencing hearing. The Petitioner alleges that all of these actions were visible to the jury.

The Petitioner asserts that there is no indication in the trial record that the Petitioner's conduct provoked the shackling. He further contends that there is no indication that he attempted any escape. To the contrary, the Petitioner maintains that his institutional record and conduct while incarcerated were exemplary. Notwithstanding, he asserts that the trial court's actions "sent an unmistakable message to the jury that [the Petitioner] could no longer be trusted to control himself physically and was now a threat . . . to the rest of the people in the courtroom."

Relying upon the United States Supreme Court's recent decision in Deck v. Missouri, 544 U.S. 622 (2005), the Petitioner asserts that he was denied a fair and reliable penalty hearing as he was denied the indicia of innocence by his shackling in front of the jurors absent a finding of facts which would necessitate said shackling. The Petitioner further asserts that the prejudice from the shackling was exaggerated due to the failure to provide an instruction to the jury that the shackling was not to influence the punishment assessed. The Petitioner further asserts that trial counsel were ineffective for failing to object to the shackling, for failing to demand a hearing regarding the need for shackling, and for failing to request an instruction regarding the shackling. In light of these alleged errors, the Petitioner further maintains that the burden falls upon the State of Tennessee to show that the error was harmless beyond a reasonable doubt.

In Deck v. Missouri, the United States Supreme Court considered for the first time whether the general rule against shackling during the guilt phase should be extended to the sentencing phase of a capital proceeding held before a jury. The Court held that "[t]he considerations that militate against the routine use of visible shackles during the guilt phase of a criminal trial apply with like force to penalty proceedings in capital cases" because the decision between life and death is "no less important than the decision about guilt." Id. at 632. The Court emphasized that "[t]he appearance of the offender during the penalty phase in shackles . . . almost inevitably implies to the jury, as a

matter of common sense, that court authorities consider the offender a danger to the community" and that shackling "almost inevitably affects the jury's perception of the character of the defendant." Id. at 633. As in the case of guilt proceedings, the Court noted the defendant's constitutional right to be free of shackles visible to the jury during capital sentencing proceedings "is not absolute." Id. As he may during the guilt phase, a trial judge may order shackling in light of "special circumstances" during the sentencing proceedings. Id. But, as in the guilt phase, the Court stressed, such a determination must be "case specific" and reflect "particular concerns" relating to the defendant on trial. Id. Accordingly, the United States Supreme Court held that courts cannot routinely place defendants in shackles or other physical restraints visible to the jury during the penalty phase of a capital proceeding absent an accounting of special circumstances, including security concerns, that may call for shackling. In doing so, it accommodates the important need to protect the courtroom and its occupants. But any such determination must be case specific; that is to say, it should reflect particular concerns, such as special security needs or escape risks, related to the defendant on trial. Id.

In Deck, the defendant was visibly shackled during the sentencing phase of a capital murder trial. Id. at 625. The high court found the visible shackling of Deck unconstitutional because the record contained no "formal or informal findings" indicating that the trial judge had required shackling in response to security or decorum concerns. Id. at 634. Nor could the Court conclude that this was "an exceptional case where the record itself makes clear that there are indisputably good reasons for shackling." Id. at 635. In the absence of such a record, the Court held that "the defendant need not demonstrate actual prejudice to make out a due process violation." Id. Rather, it is the State's burden to prove beyond a reasonable doubt that the shackling error did not contribute to the sentence. Id.

The post-conviction court noted at the onset of the post-conviction evidentiary hearing that "[the Petitioner had] never misbehaved in Court since we've had him." However, the court made the following findings of fact and conclusions of law relative to the Petitioner's claim:

> [T]he post-conviction testimony must yield to the trial record. There is nothing in the trial record to support the charge that the defendant was visibly (to jurors) shackled and that his pencil and pad were taken from him during guilt/innocence or sentencing phase. It is undisputed that during the guilt/innocence phase defendant was not shackled in view of the jury and there is nothing in the record to show any change between the two phases relative to restraints. Moreover, it is highly improbable if not inconceivable that the court and counsel (three defense lawyers plus the D.A. and staff) would have let such a thing (shackling) happen without making a record of it; and there is no record. As Mr. Googe said at the post-conviction hearing, "We didn't want him in shackles if we could avoid that." The trial record outweighs the post-conviction testimony.

> Accordingly, this court finds as a matter of fact that, at the guilt/innocence and the sentencing phase, the defendant was not visibly (to jurors) shackled or

-45-

restrained, that his writing needs were not taken from him and that he was not prejudiced in this regard.

Initially, we note that the court's observations on this matter are correct. The trial transcript fails to demonstrate that the Petitioner was visibly shackled during the penalty phase of the trial, and the transcript further fails to reflect that there was any objection to any restraints. In this regard, it is clear that the trial court found that the Petitioner failed to establish by clear and convincing evidence his allegation of visible restraints during the penalty phase of the trial. The evidence in the record does not preponderate against the findings of the trial court. The Petitioner is not entitled to relief on this claim.

## 2. *Ineffective Assistance of Counsel*

### Legal Standard

The Sixth Amendment provides, in pertinent part, that, "[i]n all criminal prosecutions, the accused shall enjoy the right. . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This right to counsel is "so fundamental and essential to a fair trial, and so, to due process of law, that it is made obligatory upon the states by the Fourteenth Amendment." Gideon v. Wainwright, 372 U.S. 335, 350 (1963) (quoting Betts v. Brady, 316 U.S. 455, 465 (1942)). Inherent in the right to counsel is the right to effective assistance of counsel. Cuyler v. Sullivan, 446 U.S. 335, 344 (1980); McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970); see also Strickland v. Washington, 466 U.S. 668, 686 (1984).

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686; see also Combs v. Coyle, 205 F.3d 269, 277 (6th Cir. 2000). A two-prong test directs a court's evaluation of a claim of ineffectiveness:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Strickland, 466 U.S. at 687; see also Combs, 205 F.3d at 277.

The performance prong of the Strickland test requires a petitioner raising a claim of ineffectiveness to show that counsel's representation fell below an objective standard of reasonableness, or "outside the range of professionally competent assistance." Strickland, 466 U.S. at 690; see also Kimmelman v. Morrison, 477 U.S. 365, 386 (1986). "Judicial scrutiny of performance is highly deferential, and '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."

-46-

Combs, 205 F.3d at 278.  Upon reviewing claims of ineffective assistance of counsel, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged actions 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689.  Additionally, courts should defer to trial strategy or tactical choices if they are informed ones based upon adequate preparation.  Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).  Finally, it is acknowledged that criminal defendants are not entitled to perfect representation, only constitutionally adequate representation.  Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996).  In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" Burger v. Kemp, 483 U.S. 776, 794 (1987).  Notwithstanding, it is the duty of this Court to "search for constitutional [deficiencies] with painstaking care" as this responsibility is "never more exacting than it is in a capital case." Id. at 785.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the Strickland test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.  In evaluating whether a petitioner satisfies the prejudice prong, a court must ask "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506 U.S. 364, 372 (1993) (citing Strickland, 466 U.S. at 687).  That is, a petitioner must establish that the deficiency of counsel was of such a degree that it deprived the defendant of a fair trial and called into question the reliability of the outcome.  For example, the evidence stemming from the failure to prepare a sound defense or to present witnesses must be significant, but it does not necessarily follow that the trial would have otherwise resulted in an acquittal.  Nealy v. Cabana, 764 F.2d 1173, 1178-1179 (5th Cir. 1985); Code v. Montgomery, 799 F.2d 1481, 1483 (11th Cir. 1986).  "A reasonable probability of being found guilty of a lesser charge, or a shorter sentence satisfies the second prong of Strickland." State v. Zimmerman, 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991); see also Chambers v. Armontrout, 907 F.2d 825, 832 (8th Cir. 1990), cert. denied, 498 U.S. 950 (1990).  Moreover, when challenging the imposition of a sentence of death, the petitioner must show that "there is a reasonable probability that, absent the errors of counsel, the sentencer . . . would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." Henley v. State, 960 S.W.2d 572, 579-80 (Tenn. 1997), reh'g denied, (1998), cert. denied, 525 U.S. 830 (1998) (citing Strickland, 466 U.S. at 695).

### a. Guilt Phase Deficiencies

The Petitioner raises numerous complaints that trial counsel, George Googe, Daniel Taylor, and Jesse Ford, III failed to function as effective counsel as guaranteed by both the Tennessee and United States Constitutions.  In this regard, the Petitioner asserts that trial counsel denied him effective assistance of counsel at the guilt phase of his capital trial by breaching acceptable standards for capital representation:

1. Counsel failed to conduct an adequate investigation of the Petitioner's family background and mental condition which precluded the diagnosis of Bipolar II Disorder.

2. Counsel's presentation of Dr. Parker's testimony was ineffective.

3. Counsel failed to challenge the composition of the jury.

4. Counsel failed to competently select a jury.

5. Counsel failed to object to the reasonable doubt instruction.

6. Counsel failed to request an instruction that the State must disprove the theory of negation of specific intent due to intoxication beyond a reasonable doubt.

## i. Investigation into Family Background and Mental Condition

The Petitioner contends that counsel's performance was deficient and prejudicial in that counsel failed to investigate and present evidence that the Petitioner suffered from Bipolar Disorder II mental disorder and neurological deficits that impair his judgment. At the post-conviction evidentiary hearing, the Petitioner presented the testimony of Dr. Woods, a neuropsychiatrist, who testified that the Petitioner suffers from Bipolar II illness. This diagnosis was based upon a review of the Petitioner's family and social histories in addition to his behavior at and after the time of the crimes. Dr. Woods testified that the Petitioner "stayed" in the hypomanic state "most of his life," however, the ingestion of drugs on the night of the crime, "pushed him into a psychotic, manic state of mind." Testimony was also admitted explaining the difficulty in diagnosing Bipolar Disorder due to the masking of symptoms. Dr. Auble testified that, after administering a battery of tests to the Petitioner, it was her conclusion that the Petitioner had some neurological impairment. Dr. Smith, an addictionologist, also diagnosed the Petitioner as having mental impairments symptomatic of Bipolar Disorder and brain damage related to memory capacity deficits.

The Petitioner contends that the number and nature of the materials supplied to Dr. Woods made a critical difference in Dr. Woods' being able to arrive at the diagnosis of Bipolar Disorder. Dr. Woods noted that certain materials were of significant importance in making a complete diagnosis, including the Petitioner's military records, the Petitioner's history of pressured speech and mood swings, and the Petitioner's genetic and family history. The Petitioner criticizes trial counsel's reliance upon the Petitioner's pre-trial evaluation for competency, sanity, and drug and alcohol dependence, asserting that these evaluations were inadequate to diagnose a lifelong condition such as Bipolar II Disorder. The Petitioner also contends that counsel's inadequacies in the area of mental disorder investigation precluded the presentation of an insanity defense at trial. In summary, the Petitioner faults trial counsel's pre-trial investigation in failing to uncover information that would have led to a diagnosis of Bipolar Disorder II in addition to expert testimony that the Petitioner was unable to form the requisite intent to commit the crime of premeditated first degree murder.

### a. Failure to Obtain Petitioner's Military Records

Trial counsel failed to obtain the Petitioner's military records. The Petitioner was in the military for a short period of time and the basis of his discharge was unknown. The defense team had information that the Petitioner left the military because he was not able to get the specific training he requested. Specifically, Mr. Taylor stated that it was his recollection that an attempt was

made to get the Petitioner's military records but he could not recall ever seeing them. Ms. Shettles stated that she did not obtain the Petitioner's military records, although this is something she would normally acquire. She testified that the only reasons why she would not have sought these records were (1) the cost of the records and (2) the length of time it would take to obtain the records.

The military records were obtained prior to the post-conviction evidentiary hearing and were used by Dr. Woods in his evaluation of the Petitioner. The records are somewhat contradictory to the Petitioner's self-reports of his military service. The Petitioner's official military records revealed that the Petitioner received an honorable discharge but was ineligible for veteran's benefits and was not allowed to re-enlist. The records indicated that the Petitioner had a contract for radio operator's school. The Petitioner was placed in the Trainee Discharge Program, which allowed him to be discharged with less than six months of service. The Petitioner began exhibiting problems in the seventh week of specialized training. Dr. Woods used this information in forming his diagnosis of the Petitioner.

Additionally, the Petitioner introduced the affidavit of Gregory Longmeyer at the post-conviction evidentiary hearing. Mr. Longmeyer's affidavit revealed that he met the Petitioner during their military service in the 1970s. The two men went through basic training together at Fort Leonard Wood, Missouri. The Petitioner informed Mr. Longmeyer that "he spent most or all of his time partying" and that "he smoked a lot of marijuana." The Petitioner also admitted to Mr. Longmeyer that he had taken "acid and speed." At this same time, the Petitioner admitted to "having sex with lots of women." In describing the Petitioner, Mr. Longmeyer related that the Petitioner talked a lot and talked very fast. He also stated that, when not in uniform, the Petitioner wore "flashy, psychedelic clothes . . . [including] a striped engineer's hat that stuck up several inches above his head and platform shoes." Regarding military service, Mr. Longmeyer stated that the Petitioner would often "get angry" with his superior officers. Mr. Longmeyer noted that the Petitioner had difficulty marching due to his height. He would often be forced to do pushups as a result. After basic training, the Petitioner and Longmeyer applied to be in the same communications training. Although Mr. Longmeyer was admitted to the program, the Petitioner was set for Morse Code training. During this time, the Petitioner and Mr. Longmeyer would "hang out together and smoke marijuana, drink some beer, and occasionally smoke some hashish." Mr. Longmeyer related that the Petitioner was having difficulty learning Morse Code and was becoming frustrated. The Petitioner become so frustrated, in fact, that he wanted out of the military. Mr. Longmeyer related that "[the Petitioner] would often talk about this and try to find a plan that would get him out of his commitment to the Army." Mr. Longmeyer related additional incidents resulting from the Petitioner's dissatisfaction with his training assignment, including the Petitioner's threat to go AWOL.

Although Dr. Woods testified that the Petitioner's military records were an integral part of his diagnosis of Bipolar Disorder, we cannot conclude that the failure to obtain these records rendered Petitioner's counsel ineffective. Mr. Longmeyer provided insight into the reason for the Petitioner's behavior, his frustration with his training assignment and his "plan" to be discharged. While Dr. Woods' testified that the Petitioner's difficulties in his training may have been an "exhortation of someone that is hypomanic," it is just as likely that the behavior was part of the

Petitioner's ultimate goal of being discharged. Thus, although trial counsel failed to obtain the military records of the Petitioner, we fail to find that such records were an integral and necessary part of forming the basis of a diagnosis of Bipolar Disorder nor were the records considered substantial mitigating evidence that would have resulted in a different sentencing decision.

### b. *Failure to Obtain a Complete Family Background History*

In reaching a diagnosis of Bipolar Disorder, Dr. Woods relied upon affidavits of the Petitioner's sister, Phyllis Jones; the Petitioner's friend, Michael Harris; and James Stevens, the Petitioner's stepson. Dr. Woods stated that these statements provided insight into the Petitioner's historical behavioral patterns which were indicative of the hypomanic state. Additionally, he stated that these affidavits, in addition to those of Flossie Mayes, a paternal aunt; David Morris, the Petitioner's nephew; Donna Marie Owens, the sister of the mother of the Petitioner's first child; Anita Stewart, the mother of the Petitioner's first child; and Karen Morris, the Petitioner's wife, were crucial with regard to establishing a genetic/family history of mental disorders.

Briefly, we will summarize the contents of the affidavits:

> Phyllis Morris Jones, the Petitioner's sister, related that their mother was very strict with them and especially hard on the Petitioner. She stated that the Petitioner was outspoken and would not back down from her. She added that their mother was "very strict about cleaning," "[e]verything always had to be in a certain place. . . . If something was missing or out of place, she would know about it and get very angry." Ms. Jones stated that their mother would chain the refrigerator at night. She described her mother as being mean one minute and nice the next. She also described her mother as being "depressed a lot." Regarding her parents' relationship, Ms. Jones stated that they never argued in front of them and, although they drank, Ms. Jones never saw her parents' drunk. Ms. Jones stated that, after her parents moved to Jackson in 1980, her father had a girlfriend, Christine. Christine became pregnant and she and the child moved into the family home. Her mother and father refused to talk about the situation and her mother always seemed to be on Christine's side. After her father died in 1995, Ms. Jones asked her mother to move to St. Louis, but she refused stating that she needed to take care of Christine and her son. Ms. Jones further related that all her mother seemed to care about was money. Regarding other family members, Ms. Jones related that her grandmother never married and had a drinking problem. Her great-grandmother was "a nice lady, but she was all about money . . . [s]he was always cleaning." As to her maternal grandfather, Ms. Jones did not know whether he committed suicide or whether he drowned. Ms. Jones stated that the Petitioner always talked fast. She also stated that the Petitioner was close to their father and very close to their paternal grandfather, Genner Morris, who had a farm in Bemis, Tennessee. Ms. Jones stated she was unaware whether the Petitioner used drugs in high school, although she did admit knowing about the Petitioner's drug use in his twenties. She described her brother as "very moody and was always in a bad mood."

Michael Harris, the Petitioner's friend, stated that he and the Petitioner grew up in the same neighborhood in St. Louis. This neighborhood was predominately white and the few blacks who lived in the area were the targets of racial violence. Mr. Harris related that the treatment by their neighbors and the police made them question their place in society. He further related that the Petitioner told him about problems with their parents, including the fact that his mother would kick him out of the house. Mr. Harris stated that he never "did drugs" with the Petitioner although they would drink alcohol and beer. He described the Petitioner as very talkative when he was drinking. Mr. Harris added that the Petitioner was "always high strung hyper." He also described the Petitioner as artistic and moody but stated that he was very popular.

Flossie Mayes, the Petitioner's paternal aunt, stated that her parents were Viola and Genner Morris. She had four siblings, Farris, Sameria, Francis and Daniel. Sameria and Francis were deceased and Daniel is suffering from senility. The Petitioner's father, Farris, passed away in 1995. Ms. Mayes described her brother's wife, Lovetta, as having "very strange ways about her," explaining that "you never could tell what mood she would be in when you saw her." She added that it was well known that Lovetta would cheat on Farris. She explained, however, that her brother loved her and did whatever she told him to do. Notwithstanding, Farris, Sr., similarly cheated on Lovetta, and had two children by other women. She also related the odd relationship between her brother, Lovetta and her brother's mistress, Christine Dodd. She added that three of them were very happy, but everyone else felt the situation was very odd. Ms. Mayes described her brother's son, [the Petitioner], as "a very happy child" and "very talkative." However, she added that [the Petitioner] did not get along with his mother, Lovetta. Ms. Mayes stated that when her brother and Lovetta moved back to Jackson, Tennessee, the Petitioner remained in St. Louis, where he started getting into trouble. On one occasion, the Petitioner arrived at her house with a gun shot wound to the leg. Ms. Mayes stated that the last time she saw the Petitioner was shortly before he was arrested. She described the Petitioner as "unusually happy" and stated that she "could tell by the way he looked and acted that he was on drugs."

David Morris, the Petitioner's nephew, stated that he was very close to his paternal grandfather, Farris Morris, Sr.. He described his grandfather as a "very energetic man. . . always on the go." He added that most of the people in his family worked hard, including his mother. He stated that everyone in his family had "a lot of energy." Mr. Morris described his grandmother, Lovetta, as a "very strange person," stating that all she ever wanted was money. He stated that his grandmother let him live with her until she could no longer claim him as a tax deduction. At that point, she kicked him out. Mr. Morris added that his grandmother was "picky about her house," "especially . . . her refrigerator." He stated that the Petitioner and Lovetta did not get along because they were "just alike." "[The Petitioner], like my

grandmother, was all about the money." Mr. Morris stated that the Petitioner preferred to be around family members rather than persons whom he was not related. He added that the Petitioner was very loyal to family. He related that his uncles, including the Petitioner, would take him riding around , during which they would be drinking pints of liquor. He described his uncles as drinking a lot but never appearing drunk. He recalled an incident where the Petitioner bought some crack cocaine in Lincoln Court. He described the Petitioner as becoming "very agitated and angry" after smoking the crack cocaine, stating that the "dude had sold him 'some bad shit.'" The Petitioner then asked for a pistol so he could shoot the man who sold him the drugs. Mr. Morris also recalled occasions that the Petitioner would sometimes arrive at his apartment in the early morning asking for money. On these occasions, the Petitioner "acted very agitated. He was sweating and talking and rambling on." Mr. Morris stated that, during a visit to St. Louis, the Petitioner obtained "a bunch of drugs of different kinds," so that he could sell them. The Petitioner often related stories about having sex with women. He also recalled that the Petitioner could "dig a grave in record time," despite the ground being hard. He described the Petitioner as "very strong." Mr. Morris stated that the Petitioner was "a talker." Regarding the situation between the Petitioner's father, mother, and Christine Dodd, Mr. Morris related that this situation upset the Petitioner.

Donna Marie Owens, the sister of the mother of the Petitioner's child Michael, stated that she grew up in the same neighborhood as the Petitioner. She described the neighborhood as predominately white and described that riots occurred in the streets between the whites and blacks. She stated that the police never arrested the white people and would only arrest the blacks. Ms. Owens stated that harassment occurred a lot and that the black children were not safe. She recalled that, during this time, the Morris home was shot into. The Morris brothers went to talk with the white boys and it turned into a fight. Only the Morris brothers were arrested. Ms. Owens further described instances of cross burnings in the yard of the black families and incidents where the white people would "throw piss on us." She stated that the Morris home had a cross burned in its yard. Ms. Owens related that the Petitioner's mother, Lovetta, was strange and was a very mean person. She stated that Lovetta verbally abused her children and cursed and yelled profanities at them. Ms. Owens stated that it was not unusual for Lovetta to throw the Petitioner out of the house. She described the Petitioner as "an easy-going person" and "very artistic." She also stated that he was "a big talker." Ms. Owens stated that her father had gotten the Petitioner a job at the Ford plant but he was fired because he was unable to get up in the mornings. The Petitioner then went to work at Belle Fountaine Mental Hospital, but he was fired from this job too. Ms. Owens related that the Petitioner had a hard time keeping a job. Ms. Owens related that the Petitioner used marijuana and would sell some to friends and family. She also stated that the Petitioner drank beer. When he was drinking, the Petitioner "seemed to talk more and ramble on about things." While the Petitioner was dating her sister, Ms. Owens stated that she knew the Petitioner was dating other women. Ms. Owens described the Petitioner's son,

Michael, as being "very jealous of his wife," and "[h]e is also arrogant and thinks he is in popular demand with the women." She stated that Michael is like his father in that neither man will back down from a confrontation. She stated that Michael has periods of depression and becomes very agitated.

James Stevens, the Petitioner's stepson, stated that he is incarcerated at South Central Correctional Center in Licking, Missouri. He related that the Petitioner is the only father he ever knew. When he was six years old, the family moved to Jackson, Tennessee. Although he described the early years as good, Mr. Stevens described changes in the Petitioner. He stated that the Petitioner was harder on him than he was on the other children. He also believed that the Petitioner was on drugs due to the Petitioner's behavior, stating that "[h]e wasn't as happy as he used to be. He was moody." On some days, the Petitioner would relegate himself to the bedroom and not see anyone. He stated that the Petitioner and Mr. Stevens' argued a lot. Mr. Stevens likened the Petitioner's behavior to that of Lovetta Morris.

Anita Stewart, the mother of the Petitioner's oldest child, stated that she and the Petitioner grew up in the same neighborhood as friends. Their friendship became a romantic relationship and the couple had a child in 1975. Ms. Stewart related that the Morris family was the only black family living on their street. Ms. Stewart reiterated the racisim present in their neighborhood, including the cross-burning and riots. She related that the Petitioner felt that the disparity in treatment between whites and blacks was unfair and would not back down in confrontations. Ms. Stewart stated that the Petitioner, one of 30 blacks out of 2000 students, had problems at school with white students and teachers. His problems resulted in his dropping out of school. Ms. Stewart related that the Petitioner had a hard time keeping a job and decided to join the Army in order to support her and the baby. She stated that the Petitioner got a general discharge from the Army. He told her that the Army was not the life he wanted; he could not conform to the rules. Ms. Stewart acknowledged that the Petitioner used marijuana, LSD, and PCP, but he would not do drugs in front of her. Ms. Stewart also conceded that the Petitioner sold marijuana because he could not keep a job. She also stated that the Petitioner drank beer and MD 20-20, "a cheap high alcohol content wine." In this regard, Ms. Stewart related that the Petitioner was not the only member of his family with a drug problem. Flossie Mayes' two children have taken "hard" drugs as well as her son, Michael. Ms. Stewart stated that the Petitioner's mother, Lovetta, played favorites among the children and grandchildren. Based on her experience working at a mental hospital, Ms. Stewart stated that she believed that Lovetta was manic-depressive. She continued to relate that on some days, Lovetta would wear underwear on her head and she would padlock the refrigerator. Ms. Stewart added that the Petitioner and his mother never got along. On one occasion, Lovetta pulled a handgun and pointed it at the Petitioner, threatening to shoot him. Ms. Stewart stated that she knew the Petitioner was seeing other women during their relationship. In early 1980, Ms. Stewart decided that she needed a stable environment without any drug problems and

[the Petitioner] was unable to provide it. When he met Karen, the relationship was over. In 1985, he moved to Jackson, Tennessee, with Karen and her children. Ms. Stewart stated that her son, Michael, was very much like the Petitioner in that he becomes agitated and talks very fast. She stated that Michael stays up very late just like the Petitioner. Ms. Stewart expressed concern over Michael's behavior.

While each of these persons provided information into the odd behavior of the Petitioner's mother and the "agitated" behavior of the Petitioner, each person also acknowledged the Petitioner's drug use. Some family members even mentioned that the Petitioner was involved in selling drugs. From reading the affidavits, it is clear that drug use was a permanent feature in the Petitioner's life.

The Petitioner blames Dr. Bernet's failure to diagnose the Petitioner with Bipolar Disorder upon trial counsel's failure to gather sufficient information. The Petitioner failed to produce testimony as to whether Dr. Bernet's diagnosis would have been different had he been privy to the additional information. Petitioner's claim is essentially one that counsel should have obtained an expert who would have diagnosed the Petitioner as Bipolar Disorder Type II.

In determining what defense to pursue, trial counsel had the pre-trial mental evaluations completed by Dr. Drewery and Dr. Pullen. Dr. Drewery interviewed the Petitioner, on September 29, 1994, for fifty minutes during which time officers advised Dr. Drewery that their presence was necessary in the examination room. The Petitioner exhibited "some slight agitation or anger." The Petitioner's statements to Dr. Drewery indicated that the Petitioner knew the nature of the charges against him and that he had previous experience with the justice system. During the interview, the Petitioner explained that he was under the influence of cocaine, stating that he had "never done as much cocaine as when I did this." The Petitioner stated that the rape accusation had "pushed [him] to the edge . . . ." Dr. Drewery concluded that the Petitioner was knowledgeable of courtroom procedures, he readily admitted cocaine use on the night in question, and the Petitioner did not present any history of mental illness or treatment for mental illness. Dr. Drewery's letter to the General Sessions Judge who ordered the evaluation indicated the following:

[S]eparate evaluations . . . were scheduled with Dr. Drewery . . . and Dr. Pullen . . . in order to determine competency to stand trial . . .; to determine mental condition at the time of the alleged crimes; and to comment on drug or alcohol dependency.

. . . [I]t was our joint opinion that the defendant is competent to stand trial . . . .

It is further our opinion that the defendant, at the time of the alleged criminal conduct as a result of mental disease or defect, did not lack the substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the

requirements of the law. The evaluations therefore do not support an insanity defense.

The defendant in interviews freely admitted substance abuse specifically cocaine and this use appears to have contributed to the charges against him. His motivation for treatment for abuse or dependency is questionable. . . .

Further forensic evaluation or treatment is not necessary prior to adjudication.

Trial counsel was also privy to an interview with the Petitioner's wife, Karen Morris, which revealed the following:

Mrs. Morris stated that [the Petitioner] was a good provider when he was not doing drugs, when he was on the drugs his money went to the drugs.

. . . Mrs. Morris stated that [the Petitioner] got in trouble on a few occasions in St. Louis and was arrested for drug charges and was placed on probation. While on probation [the Petitioner] left St. Louis and moved to Jackson, Tennessee and was later extradicted [sic], revoked and made to serve a year on these charges.

. . . Mrs. Morris stated that [the Petitioner] possibly needed a Doctors [sic] care for some type of mental disorder, [the Petitioner] had severe mood swings and was easily excited along with a very bad temper. After he started using drugs.

Ms. Shettles, though her investigation, related additional facts regarding the Petitioner's behavior and background, including but not limited to, the Petitioner's self-report of drug use beginning at age seventeen with PCP and LSD, the Petitioner's self-report of selling drugs for a steady source of income, the Petitioner's report of the lack of male friends due to his natural distrust, and the Petitioner's self-report of drug arrests and convictions. The Petitioner further related to Ms. Shettles that "the impact of the crack was a significant factor in his ideas and actions." Ms. Shettles opined, "Because of the 'coke run' [the Petitioner] was experiencing, it is my opinion that errors or inconsistencies regarding the facts of the crime may not be intentional. Because anxiety is a side effect many cocaine users experience, this factor may have played a significant role in [the Pettioner's] behavior, as well as the possibility of a drug-induced psychosis." There is evidence that Ms. Shettles related to Mr. Taylor that she was concerned that the Petitioner "may be manic depressant," characterizing him as having a "screw loose."

Dr. Parker, a pharmacologist, testified that cocaine use, in larger doses, can cause "mania" and/or "psychosis." Dr. Parker further related that the "crash phase" may last up to four days and can be accompanied by "profound depression" and "paranoia." Dr. Bernet, a psychologist, evaluated the Petitioner and testified that the cocaine affected the Petitioner both physically and psychologically. Dr. Bernet described the psychological effects as evidencing themselves in forms

-55-

of agitation, paranoia, and delusions. He further concluded that, because of the cocaine use, the Petitioner was unable to form the specific intent of premeditation and that the Petitioner was under extreme mental and emotional disturbances. Dr. Bernet stated that all of these factors affected the Petitioner's judgment and his ability to inhibit himself, his impulses, and created confusion.

The Petitioner relies upon his three experts, Dr. Woods, Dr. Auble, and Dr. Smith, to support his argument that counsel was ineffective for failing to uncover a diagnosis of Bipolar Disorder II. Dr. Auble testified that the Petitioner suffered from some brain malfunctioning, which may be consistent with head trauma or use of a chemical or drug. Dr. Smith testified that the Petitioner suffered mental impairments of hypomanic bipolar disorder and brain damage related to memory capacity deficits. Dr. Smith testified that the bipolar disorder would have made any cocaine-induced psychosis more likely and easily produced. Dr. Woods testified that the Petitioner suffered from a bipolar disorder that was most consistently a hypomanic state, meaning the Petitioner did not suffer from hallucinations and psychoses. While Dr. Woods later diagnosed the Petitioner with Bipolar Disorder II, he also stated, "Within these factors, we see the paranoid psychosis consistent with Cocaine-induced Psychosis, as well as the impaired judgment, hypersexuality and pressured speech of a Bipolar Disorder." Dr. Walker testified on behalf of the State. Dr. Walker stated that the Petitioner was intoxicated on the night of the offense. He stated that the Petitioner had a history of problems with thinking and reasoning, which probably played a role as well. He also related stress factors upon the Petitioner at the time of the offense as well as significant personality disturbances, including persistent paranoia, difficulty controlling his behavior, and difficulty with hostility. Dr. Walker stated that the Petitioner suffered personality characteristics of a paranoid and antisocial nature and had a history of hypomania. While he agreed with Dr. Woods that the Petitioner did not suffer Bipolar Disorder I, or severe Bipolar Disorder, (with the exception of the manic behavior on the night of the offenses), he did not agree with Dr. Woods' conclusion that the Petitioner suffered from substance-induced psychotic disorder. Dr. Walker further explained that diagnosing Bipolar Disorder when there is concurrent use or heavy use of alcohol and/or drugs is difficult. Dr. Walker stated that, in his opinion, it was doubtful that the Petitioner would have committed the crime "had he not been high on cocaine." Finally, we note that the Petitioner, despite Dr. Woods' diagnosis, has not ever and is not presently being treated for any mental illness, including Bipolar Disorder.

As stated previously in this opinion, the post-conviction court made the following findings of fact and conclusions of law relative to the Petitioner's complaint:

After thorough and proper investigation and preparation, counsel had no medical/scientific reason to believe that petitioner was suffering from a mental or physical disease, defect or condition (other than cocaine effects) that would have supported an insanity defense, prevented him from entertaining the requisite culpable intent or mitigated the crimes at the guilt/innocence or sentencing phase.

. . . Petitioner had no history of, and had never been treated for, mental illness or defect. Moreover, he had lived a reasonably normal life and had functioned satisfactorily. . . [t]here is no indication that he was treated for mental illness/defect

during the course of military service.

. . . During pre-trial confinement with Tennessee Department of Correction . . . petitioner was not diagnosed with, or treated for, mental illness/defect even though he was screened and facilities were readily available. . . .

. . . In short, his behavior from a lay standpoint seemed abnormal.

. . . [C]ounsel prudently petitioned the trial court for funds to retain a psychiatrist. . . . . Dr. Burnet [sic] interviewed petitioner at length . . . . Dr. Burnet [sic] testified . . . at the trial in favor of petitioner's cause, some of his testimony/conclusions being as follows:

. . . .

(b) the cocaine consumed by petitioner affected him physically and psychologically;

(c) the cocaine . . . caused . . . paranoia, confusion and delusions;

. . . .

(e) the cocaine . . . may have prevented him from entertaining the culpable intent . . . to commit any of the crimes charged;

(f) petitioner was under extreme mental and emotional stress . . .

(g) petitioner's behavior during the course of the crimes was bizarre and made no sense;

(h) signs of abnormality were clear upon interview of petitioner.

. . . Counsel had every reason to believe that if an evaluation by a neuropsychologist or neuropsychiatrist was in order that Dr. Bernet would have recommended it. He did not. As a matter of fact, it is improbable that state funds would have been authorized because counsel had no support for a motion.

. . . .

. . . [C]ounsel jointly made an informed decision . . . to pursue the theory that petitioner was unable to form the intent . . . to commit the crimes charged because of pre-existing mental health problems exacerbated by the use of a large amount of cocaine. . . . [T]hey would rely upon lay proof of apparent abnormal behavior and the expert proof provided by Dr. Bernet and Dr. Parker. . . . This strategy was reasonable if not the best.

. . . .

. . . The opinions of the [Petitioner's post-conviction] . . .experts . . . are so contradicted by the virtually undisputed facts in this case that it is improbable that they would have been accepted . . . .   Some of those facts which clearly shows motive, intent, deliberation, premeditation and mental competence follow:

(a) Petitioner was disturbed because Charles Ragland had "disrespected" him. . . and petitioner told Ragland that he would regret it. . . ;

(b) . . . [P]etitioner planned to enter Ragland's home and laid in wait for the opportunity; and in the meantime, he got his shotgun and loaded it with two shells;

(c)  Upon seeing Erica Hurd at the car, he used the shotgun to take charge of her and use her to make entry into the Ragland home;

(d)  After entry . . . by display and threat of the shotgun demanded "dope";

(e)  . . . [P]etitioner placed a pillow over Ragland's head . . . and shot him in the head . . .

(f)  Petitioner covered the windows with a mattress so that "nobody could see . . ."

(g)  Petitioner order[ed] Erica into a closet with a threat to "blow her head off";

(h)  Petitioner . . . took Erica into another room and killed her by multiple stabbings in a targeted fashion . . .

(i)  Petitioner told Angela Ragland that he had been "accused of raping someone and if he was going to jail he was going to jail for doing something" . . .

(j) Petitioner told Angela Ragland to tell police that she found the bodies . . . when she arrived at home . . .

(k)  Petitioner used a cloth in an attempt to remove his fingerprints . . .

(l)  Petitioner hid the murder weapon . . . in his apartment;

(m) Petitioner warned Angela Ragland not to go [to] the police.

. . . The evidence that would have been provided by Dr. Woods, Dr. Auble and Dr. Smith was not significantly different from that provided by Dr. Bernet and Dr. Parker.

The evidence in the record does not preponderate against the post-conviction court's findings of fact. While additional mitigation evidence does exist in the form of additional information from family members and friends, we cannot conclude that the introduction of such information to the jury would have all been beneficial mitigating evidence. That is, the information was "double-edged," while the additional information indicated a history of personality problems and a family history of personality disorders, the information also highlighted a long-history of drug abuse and illegal activity. While we do conclude that such missing information would have been beneficial to a reviewing mental health expert, we cannot conclude that had Dr. Bernet been in possession of such information that he would have made the same diagnosis as Dr. Woods and/or the impact of such a diagnosis would have such effect upon the jury as to alter the outcome. At the Petitioner's trial, Dr. Bernet and Dr. Parker testified that the Petitioner may have lacked the specific intent for premeditation as a result of his cocaine intoxication. The jury also heard testimony that the Petitioner may have been manic and psychotic at the time of the crime and was paranoid, agitated, delusional, confused, and mentally impaired. In addition to this testimony of the Petitioner's diminished capacity, the jury also heard the facts of these offenses; they heard testimony as to the Petitioner's plan to "get back at" Charles Ragland for "disrespecting" him and testimony as to the calculated nature of the Petitioner's actions. In light of this testimony and the background information in possession of the defense at the time of the trial, trial counsel cannot be faulted for failing to provide an expert that would have diagnosed the Petitioner with Bipolar Disorder. With consideration of the aggravating circumstances relied upon by the State, we cannot conclude that had expert testimony that the Petitioner suffered from Bipolar Disorder II been presented to the jury that a sentence other than death would have been imposed. The Petitioner is not entitled to relief on this basis.

The Petitioner further asserts that trial counsel's deficiencies in the investigation of the Petitioner's background foreclosed the presentation of an insanity defense at the guilt phase. The Petitioner relies upon the post-conviction testimony of Dr. Woods in support of an insanity defense. The general sessions court ordered a pre-trial mental evaluation of the Petitioner. Dr. Drewery and Dr. Pullen evaluated the Petitioner and concluded that the Petitioner was competent and that an insanity defense could not be supported based on mental disease or defect. The Petitioner faults trial counsel for relying upon these pre-trial evaluations because of the conditions under which Dr. Drewery interviewed the Petitioner and the fact that Drs. Drewery and Pullen were not privy to any background information on the Petitioner. We cannot find trial counsel deficient for relying upon the pre-trial evaluation finding the Petitioner competent and sane. We further agree with the post-conviction court that in light of the results of the court-ordered evaluation there would have most likely been no success in seeking additional funds to further explore an insanity defense. The Petitioner is not entitled to relief on this basis.

## ii. Presentation of Dr. Parker's Testimony
The Petitioner complains that trial counsel was deficient in its presentation of expert witness Dr. Robert Parker. Dr. Parker was retained by defense counsel as an expert in pharmacology. The trial court ruled that Dr. Parker could not testify about the psychological or psychiatric consequences of ingesting drugs. The court limited Dr. Parker's testimony to the effects of cocaine on a person physically and on the person's behavior. The Petitioner contends that Dr. Parker only related the

effects of cocaine upon a person generally and failed to relate the effects of cocaine upon the Petitioner specifically. The Petitioner complains that Dr. Parker's testimony was devoid of any context regarding the Petitioner's history, background, or any other mental illness that might be driving his behavior. In this regard, he notes that Dr. Parker failed to attribute the Petitioner's behavioral abnormalities to anything other than cocaine use.

At the Petitioner's trial, Dr. Parker testified, in part, as follows:

> Crack cocaine is a purified form of cocaine . . . it has very powerful effects. . . .
>
> . . . .
>
> The acute effects . . . occur within ten or fifteen seconds . . . and the primary effect is an intense –what's called 'euphoria,' . . . .
>
> In addition to that euphoria, they may experience a number of other symptoms as well. Particularly, they become very excited, they may talk very rapidly, they may sweat a lot, they can become suspicious, they can become paranoid, they lose some of their inhibitions, their judgment is impaired and it can also lead to enhanced sexual drive and sexual performance as well.
>
> The euphoria . . . usually only lasts anywhere from ten or fifteen, maybe up to thirty minutes. The other effects, however, can persist longer.
>
> . . . .
>
> . . . When they go on these runs or binges, they'll usually continue to use drugs until they don't have any more. . . . [T]he euphoric effects are diminished, they can't ever achieve the high that they got with that first dose and a lot of the euphoric effects, or the high is replaced by feelings of intense anxiety and irritability, tremendous fear, suspiciousness, paranoia.
>
> Again, their judgment can be impaired, there's an increased risk of violent or homicidal behavior . . . these effects can persist long after the high is gone. They also can experience delusions, . . . paranoia, fear, and they can even have hallucinations. . . .
>
> It can cause mania . . . . Mania is a state of heightened, both mental, as well as physical, activity. . . .
>
> Psychosis can also occur. . . . Pyschosis is when one sort of loses their concept, or idea, of what reality is so they're not able to perceive reality essentially.

See State v. Farris Genner Morris, Jr., No. 02C01-9801-CC-00012, 1999 WL 51562, at *6-7 (Tenn. Crim. App., at Jackson, Feb. 5, 1999), aff'd by, 24 S.W.3d at 788.

In addition to this testimony, Dr. Bernet, a psychiatrist, testified that, "[o]n the date of the murders, the [Petitioner's] cocaine ingestion combined with the stress of the rape accusation caused the [Petitioner] to 'becom[e] paranoid and agitated and delusional.'" Id. at *7. Dr. Bernet concluded that the Petitioner's cocaine intoxication may have prevented him from forming the intent to commit the murders. Id.

Dr. Parker's testimony at trial was based upon the Petitioner's statement, Angela Ragland's statement, and police reports. Id. The Petitioner, by his own admission, was under the effect of significant cocaine ingestion at the time of the offenses. Testimony related to the effect of cocaine intoxication was relevant and reasonable. In light of the fact that Dr. Bernet's testimony reflected the impact of the cocaine intoxication upon the Petitioner specifically, we fail to find how trial counsel was deficient. Moreover, we conclude that the presentation of Dr. Parker as an expert witness was a reasoned strategic choice made by defense counsel. The Petitioner is not entitled to relief on this claim.

### iii.  Selection of the Jury

The Petitioner makes numerous challenges regarding trial counsel's failure to competently select the jury and to challenge the impaneling of an all-Caucasian jury. Included within the Petitioner's challenges are his allegations that trial counsel did not adequately voir dire prospective jurors on their respective attitudes about the death penalty, including the failure to ask questions designed to reveal jurors' biases and questions regarding the jurors' ability to give effect to mitigating evidence.

Defendants are entitled to a petit jury selected from a representative cross-section of the community. Taylor v. Louisiana, 419 U.S. 522 (1975). The Taylor Court held, "[T]he jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." Id. at 538. In Duren v. Missouri, 439 U.S. 357 (1979), the Supreme Court set forth a three-pronged test for determining whether a jury was properly selected from a fair cross-section of the community:

> (1) [T]he group alleged to be excluded is a "distinctive" group in the community;
> (2) [T]he representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and
> (3) [T]his under-representation is due to systematic exclusion of the group in the jury-selection process.

Id. at 364. In support of his allegation that he was denied a trial by a jury that fairly represented the community in which he was tried, the Petitioner relies upon data establishing that "Madison County has a population that is 65.2 % white and 32.5 % black . . . ." (citing 2000 U.S. Census, (http://factfinder.census.gov)).

The courts may not use statistics alone to find a prima facie case of exclusion. State v. Nelson, 603 S.W.2d 158 (Tenn. Crim. App. 1980). Rather, proof of a substantial disparity coupled with systematic exclusion is required. Id. at 163 n.3. The Nelson court determined that the systematic exclusion prong of the test had been established by proof that the statistical disparity occurred not just occasionally but in every venire for a period of four years, explaining that "[s]uch evidence 'manifestly indicates that the cause of the underrepresentation was systematic that is, inherent in the particular jury-selection system utilized.'" Id. at 165 (quoting Duren, 439 U.S. at 366). In Truesdale v. Moore, 142 F.3d 749, 755 (4th Cir. 1998), the court explained that a statistical disparity does not, by itself, establish systematic exclusion of a group from the jury pool.

As noted by the Petitioner, he must establish that the under-representation was due to systematic exclusion of the group in the jury-selection process. The Petitioner asserts that he was prohibited from gaining the information necessary to support his claim. Indeed, Petitioner "attempted to interview the jury commissioners and to obtain the jury venires from the Circuit Court Clerk." The Petitioner states that the "Clerk indicated that she could only provide the requested information if given a court order. The jury commissioners informed counsel . . . that they were prohibited by law from discussing their duties as jury commissioner." (citing Tenn. Code Ann. § 22-2-203). In an attempt to garner necessary information, Petitioner states that he filed a "Motion for Access to All Jury Pool Information and to Interview Jury Commissioners." The post-conviction court declined to order either the clerk or the jury commissioner to speak to post-conviction counsel or provide the Petitioner with the requested information. In denying the Petitioner's request, the post-conviction court noted that

> [t]he petitioner has failed to state any particular reason as to why this information is needed other than the fact that there might be some evidence of impropriety. Before the Court should authorize such access the petitioner should demonstrate to the Court some substantial reason for allowing the access and that having such access is likely to result in some proof. The petitioner simply has not demonstrated that any such proof is likely to exist.

Notwithstanding, the fact that the post-conviction court denied Petitioner access to the jury pool information does not preclude this Court from reviewing the claim. At the post-conviction evidentiary hearing, Mr. Googe testified that the jury in the Petitioner's trial was all-Caucasian. At the time of the trial, Mr. Googe estimated that approximately thirty percent of the residents of Madison County were African-American. He further stated that probably less than thirty percent of the total venire were African-American. He stated that the composition of the jury pool "was fairly consistent with what [he's] seen in other trials, although the finished product – the jury of twelve was not necessarily that." Mr. Googe added that, since the Petitioner's trial, the percentage of African-Americans on Madison County jury panels has increased. It is clear from this testimony that there was a proportionate representation of African-Americans on the venire. Accordingly, there is no proof that African-Americans were under-represented on the venire even though no African-Americans were ultimately selected for the jury. In light of this conclusion, there can be no finding of error on behalf of trial counsel in not challenging the composition of the jury.

The Petitioner also faults counsel for failing to conduct an adequate voir dire of the venire. Specifically, the Petitioner contends that trial counsel failed to adequately question prospective jurors as to the meaning of "mitigating evidence[,]" that counsel failed to adequately "death qualify" the venire, and that trial counsel failed to ask prospective jurors as to racial bias. The ultimate goal of voir dire is to insure that jurors are competent, unbiased, and impartial. State v. Mann, 959 S.W.2d 503, 533 (Tenn. 1997), reh'g denied, (1998), cert. denied, 524 U.S. 956 (1998); State v. Cazes, 875 S.W.2d 253, 262 (Tenn. 1994). There is no constitutional right that a defendant is entitled to have questions posed to the venire specifically directed to matters that conceivably might prejudice venire men against him. See Ristaino v. Ross, 424 U.S. 589, 594 (1976) (citing Ham v. South Carolina, 409 U.S. 524, 527-28 (1973)). Moreover, in the capital murder context, where the jury in the punishment phase must choose between life and death, several courts have held that not questioning as to whether a prospective juror can fairly consider a life sentence does not necessarily constitute deficient performance. Hartman v. State, 896 S.W.2d 94, 105 (Tenn. 1995); Stanford v. Parker, 266 F.3d 442, 453-54 (6th Cir. 2001); Commonwealth v. Morris, 684 A.2d 1037, 1042-43 (Pa. 1996).

From the facts before this Court, we cannot conclude that the Petitioner's trial was "fundamentally unfair." Each of the jurors ultimately impaneled made unqualified assertions that they could be fair and impartial. The transcript before this Court does not demonstrate any fundamental unfairness in the conduct of the trial. Indeed, "where a juror is not legally disqualified or there is no inherent prejudice, the burden is on the [d]efendant to show that a juror is in some way biased or prejudiced." State v. Caughron, 855 S.W.2d 526, 539 (Tenn. 1993), cert. denied, 510 U.S. 979 (1993) . In the present case, the Petitioner has failed to establish that he was not provided a trial cloaked with guarantees of fundamental fairness. Nor has the Petitioner established the racial bias of any of the jurors ultimately impaneled. Accordingly, we cannot conclude that trial counsel was deficient in performing an adequate voir dire. This issue is without merit.

## iv. Jury Instructions

The Petitioner raises two allegations of attorney error in that counsel failed to object to the reasonable doubt instruction and that counsel failed to request an instruction as to the State's burden of disproving the defense theory of negation. The allegations of error are as follows:

(1) Counsel were ineffective for failing to object to the reasonable doubt instruction on the basis that the instruction referring to the required degree of proof as being to a "moral certainty" created a reasonable likelihood that the jury viewed the requisite quantum of proof as below that which is required by the Due Process Clause;

(2) Counsel were ineffective for failing to request an instruction that the State must disprove the defense theory of negation of specific intent due to intoxication beyond a reasonable doubt.

Neither of the Petitioner's arguments amount to deficient performance by trial counsel. First, our supreme court has repeatedly rejected the argument that the term "moral certainty" in the reasonable doubt instruction creates a reasonable likelihood that the jury will view the required burden of proof as below that required by the Due Process Clause. See Nichols v. State, 877 S.W.2d 722, 734 (Tenn. 1994); see also Owens v. State, 13 S.W.3d 742, 765 (Tenn. Crim. App. 1999), perm. to appeal denied, (Tenn. 2001). Next, the post-conviction court correctly noted that the trial court

provided instructions provided in the Tennessee Pattern Jury Instructions. The pattern instruction reflects an accurate recitation of the applicable law as to the defense of voluntary intoxication. We cannot conclude that additional instructions would have affected the result of the Petitioner's trial. Accordingly, the Petitioner is not entitled to relief on this claim.

### b. Penalty Phase Deficiencies

The Petitioner raises several complaints regarding trial counsel's performance during the penalty phase of his capital trial. Specifically, the Petitioner contends that trial counsel, George Googe, Daniel Taylor and Jesse Ford, III failed to function as effective counsel as guaranteed by both the Tennessee and United States Constitutions by breaching acceptable standards for capital representation:

1. Counsel failed to properly investigate and prepare mitigation evidence.
2. Counsel failed to properly utilize and/or supervise the services of the mitigation specialist.
3. Counsel failed to obtain sufficient funds for mitigation investigation.
4. Counsel failed to object to the instruction on the "heinous, atrocious or cruel" aggravating factor.
5. Counsel failed to object to the reasonable doubt instruction.
6. Counsel failed to object to an instruction that misstated the role of the jury after finding an aggravator.
7. Counsel failed to request an instruction requiring the jury to specify which felony it was relying upon for the felony murder aggravator.
8. Counsel failed to request an instruction that the jury could consider, in mitigation, something less than the statutory mitigating circumstance of extreme mental or emotional disturbance and that the Petitioner was substantially impaired as a result of mental disease or defect or intoxication.

#### i. Failure to Properly Prepare Mitigation Evidence

In the context of capital cases, a defendant's background, character, and mental condition are unquestionably significant. "[E]vidence about the defendant's background and character is relevant because of the belief . . . that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." California v. Brown, 479 U.S. 538, 545 (1987); see Eddings v. Oklahoma, 455 U.S. 104, 113-15 (1982); Lockett v. Ohio, 438 U.S. 586, 604-05 (1978) (plurality opinion); Zagorski v. State, 983 S.W.2d 654, 657-58 (Tenn. 1998). However, the right that capital defendants have to present a vast array of personal information in mitigation at the sentencing phase is constitutionally distinct from the question of whether counsel's choice of what information to present to the jury was professionally reasonable.

There is no constitutional imperative that counsel must offer mitigation evidence at the penalty phase of a capital trial. Nonetheless, the basic concerns of counsel during a capital sentencing proceeding are to neutralize the aggravating circumstances advanced by the State and to present mitigating evidence on behalf of the defendant. Although there is no requirement to present

mitigating evidence, counsel does have the duty to investigate and prepare for both the guilt and the penalty phase. See Goad v. State, 938 S.W.2d 363, 369-70 (Tenn. 1996).

To determine whether or not trial counsel was ineffective for failing to present mitigating evidence, the reviewing court must consider several factors. First, the reviewing court must analyze the nature and extent of the mitigating evidence that was available but not presented. Id. at 371 (citing Deutscher v. Whitley, 946 F.2d 1443 (9th Cir. 1991); Stephens v. Kemp, 846 F.2d 642 (11th Cir. 1988); Adkins v. State, 911 S.W.2d 334 (Tenn. Crim. App. 1994); Cooper v. State, 847 S.W.2d 521, 532 (Tenn. Crim. App. 1992)). Second the court must determine whether substantially similar mitigating evidence was presented to the jury in either the guilt or penalty phase of the proceedings. Id. (citing Atkins v. Singletary, 965 F.2d 952 (11th Cir. 1992), cert. denied, 515 U.S. 1165 (1995); Clozza v. Murray, 913 F.2d 1092 (4th Cir. 1990), cert. denied, 499 U.S. 913, 111 (1991); State v. Melson, 722 S.W.2d 417, 421 (Tenn. 1989)). Third, the court must consider whether there was such strong evidence of applicable aggravating factor(s) that the mitigating evidence would not have affected the jury's determination. Id. (citing Fitzgerald v. Thompson, 943 F.2d 463, 470 (4th Cir. 1991), cert. denied, 502 U.S. 1112 (1992); Elledge v. Dugger, 823 F.2d 1439 (11th Cir. 1987), cert. denied, 485 U.S. 1014 (1988)).

Although there is no absolute duty to investigate particular facts or a certain line of defense, counsel does have a duty to make reasonable investigation or to make a reasonable decision that makes particular investigation unnecessary. Strickland, 466 U.S. at 691. In determining whether counsel breached this duty, counsel's performance is reviewed for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's prospective at the time. Wiggins v. Smith, 539 U.S. 510, 523 (2003). Counsel is not required to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Id. at 533. Neither is counsel required to interview every conceivable witness. Hendricks v. Calderon, 70 F.3d 1032, 1040 (9th Cir. 1995). In other words, counsel's duty to investigate and prepare is not limitless. See Washington v. Watkins, 655 F.2d 1346 (5th Cir. 1981). Counsel's performance will not be found deficient for failing to unveil all mitigation evidence, if after a reasonable investigation, nothing has put counsel on notice of the existence of that evidence. See Babbit v. Calderson, 151 F.3d 1170, 1174 (9th Cir. 1998). In summary,

> no particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel. Rather, courts must judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and judicial scrutiny of counsel's performance must be highly deferential.

Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000) (citations and quotations omitted).

First, we note that the Petitioner's complaints regarding trial counsel's failure to present sufficient mitigating evidence are intertwined with his complaints that counsel failed to complete a sufficient pre-trial investigation to support a diagnosis of Bipolar Disorder II. In as much as these

-65-

claims have already been addressed by this Court, we elect not to undertake a second review of his complaints. While, based upon the testimony of the Petitioner's post-conviction experts, it does appear that additional mitigation evidence exists, it is unclear as to how beneficial the information would have been given its negative connotations. Most of the beneficial mitigating evidence, i.e., the Petitioner's odd behaviors and mistreatment by his mother, were already presented to the jury by other witnesses. Additionally, some of the missing information would have been harmful because it revealed and supported the Petitioner's long-time drug use and also indicated that the Petitioner relied upon the sale of illegal drugs as a source of income.

Regarding the post-conviction diagnosis of Bipolar Disorder II, we acknowledge that, if the sentencer is to make an individualized assessment of the appropriateness of the death penalty, "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." Penry v. Lynaugh, 492 U.S. 302, 319 (1989) (quoting California v. Brown, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)). "Even if evidence of a mental condition is not strong enough to convince a jury to accept an insanity or diminished-capacity defense, the evidence might cause that jury not to recommend a sentence of death." Schneider v. Delo, 85 F.3d 335, 340 (8th Cir. 1996) (citing Eddings, 455 U.S. at 113). Case law presents a spectrum of decisions concerning whether an attorney's failure to present mitigating evidence constitutes ineffective assistance. See Schneider, 85 F.3d at 340-41 (no ineffective assistance for failing to introduce evidence that defendant suffered from an attention-deficit disorder and insomnia); Guinan v. Armontrout, 909 F.2d 1224, 1229 (8th Cir. 1990) (same regarding an anti-social personality disorder); Hill v. Lockhart, 28 F.3d 832, 846-47 (8th Cir. 1994) (ineffective assistance for failing to introduce at penalty phase evidence that defendant suffered from paranoid schizophrenia and reliance upon anti-psychotic drugs); Antwine v. Delo, 54 F.3d 1357, 1368 (8th Cir. 1995) (same regarding defendant's bipolar disorder).

In the present case, trial counsel presented mental expert testimony regarding the Petitioner's history of drug abuse and evidence that the cocaine resulted in a psychosis at the time of the crime. To prevail on a claim of trial counsel's ineffectiveness, both substandard performance and prejudice caused by the performance must be shown. Strickland, 466 U.S. at 668. To meet the Strickland test, a defendant has the burden of proving that counsel's representation was unreasonable under prevailing professional norms and that the complained about conduct was not the result of a strategic decision. Id. at 688-89. A defendant must demonstrate "a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." Id. at 694. The Petitioner has failed to meet this standard. First, even if a defendant did have a significant psychological disorder, the sentencing court or jury may conclude that the mitigation evidence was not sufficient to preclude the imposition of the death penalty when weighed against the aggravating evidence. Evidence of a defendant's mental or psychological impairments may not be inherently mitigating, or may not be mitigating enough to overcome the evidence in aggravation. A judge or jury considering evidence of this nature at sentencing might view the information as either mitigating or aggravating, depending of course, on whether the individual hearing the evidence finds that it evokes compassion or demonstrates possible future dangerousness. With consideration of the aggravating

circumstances relied upon by the State, we cannot conclude that had additional mitigating evidence as to Bipolar Disorder II been presented at trial that a sentence other than death would have been imposed. The Petitioner is not entitled to relief on this basis.

## ii. Failure to Properly Utilize Mitigation Specialist

The Petitioner contends that trial counsel failed to properly utilize the services of mitigation specialist, Glori Shettles. In this regard, the Petitioner asserts that "Tennessee does not place any 'evidentiary hurdle in the way of establishing mitigating facts . . .'" and there are "virtually no limits placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances." See Tennard v. Dretke, 542 U.S. 274 (2004). The Petitioner further asserts that defense counsel are under a mandate for developing mitigation evidence.

In the present case, the Petitioner asserts that trial counsel's failure to discover that the Petitioner suffered from a Bipolar II mental illness was a direct result of counsel's failure to ensure that a thorough mitigation investigation was conducted. Specifically, the Petitioner faults counsel for "ignor[ing] the long understood need to interview extended family members, as well as family friends, neighbors, teachers and clergy." This claim essentially encompasses his claims that counsel failed to present and develop mitigation evidence and that counsel failed to obtain sufficient funds for the mitigation investigation. Accordingly, these allegations of deficient performance are addressed in this Court's review of each specific claim. Because this constitutes a specific individual claim of deficient performance, we find no fault in counsel for failing to instruct Ms. Shettles as to how to perform her job in an area in which she is supposed to be an expert. The Petitioner is not entitled to relief on this claim.

## iii. Failure to Obtain Sufficient Funds for Mitigation Investigation

Trial counsel's motions for a court-appointed mitigation specialist were granted and counsel received $6,500.00 for the services of Glori Shettles, a mitigation specialist with Inquisitor, Inc. The Petitioner complains, however, this limited budget prevented Ms. Shettles from performing a thorough and complete investigation. Accordingly, the Petitioner contends that trial counsel was ineffective for failing to seek additional funding for the mitigation specialist. We conclude that the Petitioner attempts to intersperse this claim with his contentions that counsel failed to prepare a complete mitigation investigation. This Court declines to commingle the issues and has already addressed the previous claim.

Regarding his claim that counsel failed to obtain sufficient funding, we conclude that the Petitioner has failed to present any evidence that Ms. Shettles failed to complete any investigation for which compensation was denied or that she requested additional funding and was denied. At the post-conviction evidentiary hearing, Ms. Shettles commented that the defense attorneys were concerned about the cost of her investigation. Contained in Ms. Shettles' lengthy affidavit, she stated, "The nature and extent of the investigation and assessment necessary to adequately prepare for a capital murder trial, including penalty phase, generally requires a minimum of nine months time." Ms. Shettles then delineated a number of factors that would alter this generic time frame. She further related that the time frame for collecting relevant documents "typically takes a total of between 100 and 200 hours spread over time to complete." Ms. Shettles stated that, once documents

are retrieved, an investigation of the client's life "can begin in earnest." She added that the cost and amount of time varied per case but would normally take between 100 and 200 hours spread over time. Regarding a mitigation investigation in the present case, Ms. Shettles estimated that, based upon prior investigations, a "complete and thorough mitigation investigation . . . will necessitate between 200 and 300 hours." Her fee is $55.00 per hour plus expenses. Accordingly, we have calculated that Ms. Shettles would expect a fee of $16,500.00 for a mitigation investigation in the present case. We assume that Ms. Shettles finds the $6,500.00 actually paid in this matter woefully insufficient, especially with consideration that the second grant of funds, $3,500.00, were earmarked for Ms. Shettles' trial services and not for mitigation investigation. Notwithstanding, these complaints in Ms. Shettles' affidavit appear to be in conflict with her testimony at the post-conviction evidentiary hearing that "there was money left . . . maybe a few hundred dollars that was left out of that remaining money."

Again, the Petitioner asserts that the limitation of funds severely restricted and impeded the thoroughness of Ms. Shettles' investigation. He blames trial counsel for the lack of sufficient funds for a complete mitigation investigation. The testimony at the post-conviction hearing belies this statement. This Court cannot conclude that Ms. Shettles required additional funding when she failed to request the same and, in fact, had "money left . . . maybe a few hundred dollars." Trial counsel shall not be found deficient for the failure to request additional funding when there was no indication from the retained mitigation specialist that additional funding was necessary. The Petitioner is not entitled to relief on this issue.

### iv. Jury Instructions

The Petitioner raises several allegations of attorney error in the form of the failure to object to certain jury instructions provided at the penalty phase and in the form of the failure to request jury instructions regarding mitigating factors and an aggravating circumstance. Specifically, the Petitioner's attack encompasses both the performance of trial and appellate counsel and takes the following forms:

(1) Counsel were ineffective for failing to object to the State's use of overly broad and unconstitutional aggravating factor, "heinous, atrocious or cruel;"
(2) Counsel were ineffective for failing to object to the reasonable doubt instruction on the basis that the instruction referring to the required degree of proof as being to a "moral certainty" created a reasonable likelihood that the jury viewed the requisite quantum of proof as below that which is required by the Due Process Clause;
(3) Counsel were ineffective for failing to object to an instruction that misstated the role of the jury after finding an aggravating factor;
(4) Counsel were ineffective for failing to request an instruction requiring the jury to specify which felony it was relying upon for the felony murder aggravating circumstance; and
(5) Counsel were ineffective for not submitting instructions that the jury could consider in mitigation something less than the statutory mitigating circumstance of "extreme" mental or emotional disturbance and that the Petitioner was "substantially" impaired as a result of a mental disease or defect or intoxication which was insufficient to establish a defense to the crime but which "substantially" affected the Petitioner's judgment.

With respect to the Petitioner's claims, we conclude that he is not entitled to relief on any of the individual allegations of attorney error. First, our supreme court has repeatedly rejected challenges to the "heinous, atrocious or cruel" aggravating circumstance, including those challenges made by the Petitioner. See Terry v. State, 46 S.W.3d 147 (Tenn. 2001), cert. denied, 534 U.S. 1023 (2001); State v. Middlebrooks, 995 S.W.2d 550, 555-56 (Tenn. 1999); State v. Blanton, 975 S.W.2d 269, 280 (Tenn. 1998), cert. denied, 525 U.S. 1180 (1999). Second, our supreme court has repeatedly rejected the argument that the term "moral certainty" in the reasonable doubt instruction creates a reasonable likelihood that the jury will view the required burden of proof as below that required by the Due Process Clause. See Nichols v. State, 877 S.W.2d 722, 734 (Tenn. 1994); see also Owens v. State, 13 S.W.3d 742, 765 (Tenn. Crim. App. 1999), perm. to appeal denied, (Tenn. 2001).

Petitioner has failed to establish how he was prejudiced by counsel's failure to request specific instructions on mitigating evidence. The Petitioner concedes that the trial court charged the jury the catch-all provision of section 39-13-204(j)(9), Tennessee Code Annotated, which provides that the jury may consider "[a]ny other mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilt or sentencing hearing." Moreover, the courts of this state have consistently held that the trial court was not required to charge the jury on specific, non-statutory mitigating circumstances at the time of this offense and trial. See State v. Cauthern, 967 S.W.2d 726, 747 (Tenn. 1998). Accordingly, trial counsel were not deficient for failing to request such an instruction.

The Petitioner also contends that trial counsel should have requested an instruction that required the jury to specify which underlying felony it relied upon in finding the felony murder aggravating circumstance. In support of this point of error, the Petitioner relies upon case law from the state of New Jersey. Nothing in the jurisprudence of this state requires that the jury specify the underlying felony when finding proof of the Tennessee Code Annotated section 39-13-204(i)(7) aggravator beyond a reasonable doubt. In this regard, we do not fault counsel for failing to advance case law of another jurisdiction before a court of this state.

Finally, the Petitioner faults trial counsel for failing to object to an instruction that misstated the role of the jury after the finding of an aggravator. The Petitioner contends that instructing the jury that "[y]ou shall not take into account any other facts or circumstances as the basis for deciding whether the death penalty or imprisonment for life without parole would be appropriate punishment . . ." implies that the death penalty or life without parole is "appropriate" rather than making the Petitioner eligible. Accordingly, he asserts that the instruction is prejudicial and shifts the burden to the Petitioner to prove that the death sentence is not the "appropriate" sentence. The Petitioner fails to place this sentence in the context of the instruction in which it is provided. Our supreme court has upheld this particular instruction in prior decisions. See State v. Keen, 31 S.W.3d 196, 232 (Tenn. 2001). We cannot find trial counsel deficient for failing to object to this instruction.

## C. Constitutionality of the Death Penalty in Tennessee

The Petitioner raised numerous challenges to the constitutionality of the imposition of the death penalty. In essence, he asserts that his sentence of death must be vacated because the trial and appellate proceedings were rife with constitutional error. We agree with the State that these claims should have been raised in prior proceedings. Accordingly, the Petitioner's claims are waived. See Tenn. Code Ann. § 40-30-106(g). Additionally, the Petitioner concedes that many of his claims "ha[ve] been ruled upon in the opinion on direct appeal, however, the [Petitioner] is compelled to preserve all issues for later possible federal review." In this regard, we note that the following claims have previously been reviewed and rejected on direct appeal and are not appropriate for this Court's review at this stage:

1. Tennessee's death penalty statutes fail to meaningfully narrow the class of death eligible defendants, specifically because Tenn. Code Ann. § 39-13-204(i)(4), (5), (6), and (7) encompass a majority of the homicides committed in Tennessee. These arguments have been rejected by our supreme court.

2. The death sentence is imposed capriciously and arbitrarily in that:

(1) Unlimited discretion is vested in the prosecutor as to whether or not to seek the death penalty. This argument has been rejected.

(2) The death penalty is imposed in a discriminatory manner based upon economics, race, geography, and gender. This argument has been rejected.

(3) There are no uniform standards or procedures for jury selection to insure open inquiry concerning potentially prejudicial subject matter. This argument has been rejected.

(4) The death qualification process skews the make-up of the jury and results in a relatively prosecution prone guilt-prone jury. This argument has been rejected.

(5) Defendants are prohibited from addressing jurors' popular misconceptions about matters relevant to sentencing, i.e., the cost of incarceration versus cost of execution, deterrence, method of execution. This argument has been rejected.

(6) The jury is instructed that it must agree unanimously in order to impose a life sentence, and is prohibited from being told the effect of a non-unanimous verdict. This argument has been rejected.

(7) Requiring the jury to agree unanimously to a life verdict violates Mills v. Maryland and McKoy v. North Carolina. This argument has been rejected.

(8) The jury is not required to make the ultimate determination that death is the appropriate penalty. This argument has been rejected.

(9) The defendant is denied final closing argument in the penalty phase of the trial. This argument has been rejected.

3. Appellate Review process in death penalty cases is constitutionally inadequate.

The defendant argues that the appellate review process in death penalty cases is constitutionally inadequate in its application. He contends that the appellate review process is not constitutionally meaningful because the appellate courts cannot reweigh proof due to the absence of written findings concerning mitigating circumstances, because the information relied upon by the appellate courts for comparative review is inadequate and incomplete, and because the appellate courts' methodology of review is flawed. This argument has been specifically rejected by our supreme court on numerous occasions. Moreover, the supreme court has recently held that, "while important as an additional safeguard against arbitrary or capricious sentencing, comparative proportionality review is not constitutionally required."

Morris, 24 S.W.3d at 814-15 (Appendix) (footnotes and citations omitted).

Notwithstanding, inasmuch as the Petitioner related his claims to an allegation of ineffective assistance of counsel and/or new constitutional claims, we proceed to address the remaining claims on the merits.

### 1. **Death Sentence Infringes upon the Petitioner's Fundamental Right to Life**

The Petitioner asserts that the death sentence infringes upon his fundamental right to life and is not necessary to promote any compelling state interest. This complaint – that his death sentence must be reversed because it violates his "fundamental right to life" – is contrary to settled precedent as reflected in Cauthern, 145 S.W.3d at 629 (citing Nichols, 90 S.W.3d at 604; State v. Mann, 959 S.W.2d 503, 536 (Tenn. 1997) (Appendix); State v. Bush, 942 S.W.2d 489, 523 (Tenn. 1997)). Accordingly, the Petitioner is not entitled to relief on this issue.

### 2. **Failure to Charge Aggravating Circumstance in Indictment Violates Due Process**

The Petitioner next asserts that his sentence of death violates the due process clause, article I, section 8 of the Tennessee Constitution and the Fourteenth Amendment to the United States Constitution. Relying upon Apprendi v. New Jersey, 530 U.S. 466 (2000), he argues that his indictment was flawed because the aggravating circumstances which made him eligible for the death penalty were not submitted to the grand jury nor returned in the indictment.

The Petitioner's argument is based upon the premise that first degree murder is not a capital offense unless accompanied by aggravating factors. Thus, he alleges that to satisfy the requirements of Apprendi, the indictment must include language of the statutory aggravating circumstances to elevate the offense to capital murder. This argument has recently been rejected by our supreme court

-71-

in State v. Holton, 126 S.W.3d 845 (Tenn. 2004); see also State v. Berry, 141 S.W.3d 549, 558-62 (Tenn. 2004). The Petitioner is not entitled to relief on this claim.

### 3. Sentence of Death Violates International Law

The Petitioner asserts that Tennessee's imposition of a death penalty violates treaties of the United States and, hence, the federal constitution's Supremacy Clause. It appears that Petitioner contends that the Supremacy Clause was violated when the Petitioner's rights under treaties and customary international law to which the United States is bound were disregarded. Arguments that the death penalty is unconstitutional under international laws and treaties have systematically been rejected by the courts. See State v. Odom, 137 S.W.3d 572, 600 (Tenn. 2004). We discern no viable reason to resolve this issue in a different manner in this case. The Petitioner is not entitled to relief on this issue.

### 4. Introduction of Victim Impact Evidence Violates Separation of Powers
### and
### 5. Waiver of Mitigation Proof by Defendants

In his final challenges, the Petitioner contends that the mandatory introduction of victim impact evidence violates the doctrine of separation of powers and asserts that "damaged, depressed, and mentally ill defendants are allowed to waive presentation of available mitigation" deprives the jury of essential information in determining "whether someone should live or die." First, we acknowledge that the Petitioner's claims regarding the waiver of mitigation proof is irrelevant to his case, since the Petitioner presented mitigating evidence during the penalty phase. Moreover, these claims have previously been rejected by the courts of this state. See State v. Thomas, 158 S.W.3d 361, 407 (Tenn. 2005) (Appendix); Odom, 137 S.W.3d at 602.

### Conclusion

After a thorough review of the record and the law applicable to the issues raised herein, we conclude that the Petitioner has failed to prove the factual allegations contained in his post-conviction petition by clear and convincing evidence. The evidence does not preponderate against the findings of the post-conviction court. The post-conviction court properly denied relief. Accordingly, the judgment is affirmed.

_____
DAVID H. WELLES, JUDGE